GAY et al. v. HUDSON RIVER ELECTRIC POWER CO. et al.

In re QUINN.

(Circuit Court, N. D. New York. July 23, 1910.)

1. BILLS AND NOTES (§ 363*)—TRANSFER—RIGHT OF TRANSFEREE—COLLATERAL SECURITY.

A company sold goods under a contract, among other things retaining title until payment of the price. Purchase-money notes were given and subsequently were transferred to a purchaser for value, without transfer of the contract. It did not appear that the company abandoned the lien before transferring the notes. *Held*, that the transfer of the notes carried with it the contract in so far as it reserved title to the goods, as collateral security for payment of the notes, though the transferee was at the time of the transfer ignorant of the existence of the contract.

[Ed. Note.—For other cases, see Bills and Notes, Dec. Dig. § 363.*]

2. BILLS AND NOTES (§ 363*)—TRANSFER—RIGHT OF TRANSFEREE—COLLATERAL SECURITY.

The transferee was not estopped from asserting his lien because he filed a claim against the maker's receivers, stating that he had no security, when in fact he did have but was ignorant thereof.

[Ed. Note.—For other cases, see Bills and Notes, Dec. Dig. § 363.*]

Action by Eben H. Gay and another against the Hudson River Electric Power Company and others. Petition by John C. Quinn for a lien on certain property. Judgment for petitioner.

See, also, 178 Fed. 499.

This is a petition by John C. Quinn to have George W. Dunn, Milton De Lano, and Charles W. Andrews, receivers appointed in the above-entitled

action and continued as such in certain mortgage foreclosure proceedings now pending, authorized by the court instructed to carry out the terms of a certain contract entered into between the Engineer Company and the Hudson River Electric Power Company, by paying to said Quinn the sum of $2,500, with interest from May 28, 1908, and also desires the court to hold that if not paid said Quinn is entitled to the property mentioned in such agreement.

Walter A. Chambers, for petitioners.
Abram J. Rose and Geo. B. Curtiss, for receivers.

RAY, District Judge. The material facts proved, and which I find from the evidence given before the special master, are as follows:

(1) March 30, 1898, the Engineer Company made a written contract with the Hudson River Electric Power Company whereby it agreed to sell to the power company, and that company agreed to purchase and have installed, what is known as the "balanced draft system," being certain appliances and personal property. The property was delivered, received, accepted, and installed by the power company at its plant in Utica, N. Y., and pursuant to the agreement the power company gave to the Engineer Company in payment therefor $1,000 and four notes of $1,000 each made by said company and indorsed as required by the contract and dated May 28, 1908. The notes were to run for 2, 4, 6, and 8 months. Article 4, § 1, provided as follows:

"The title to the apparatus herein sold shall not pass from the contractor (Engineer Company) until all payments hereunder (including deferred payments if any) shall have been fully made in cash. The purchaser agrees to do all the acts necessary to maintain and perfect such retention of title in the company as well as protect the apparatus from all damages whatsoever."

The clause of the contract relating to payment reads as follows:

"The price of the 'balanced draft system' as furnished by the contractor and the license to operate the same under the patents controlled by the Engineer Company in connection with the boilers herein specified shall be the sum of five thousand dollars ($5,000) payable one thousand dollars ($1,000) May 15, 1908, the balance by four notes for one thousand dollars ($1,000) each, for 2, 4, 6 and 8 months, with interest, upon delivery of materials; said notes to be made by the Hudson River Electric Power Company and indorsed by Eugene L. Ashley and by E. H. Gay and Company."

It also contained the following:

"The purchaser agrees in case additional boilers are installed in this plant to equip them with the balanced draft system to the extent of the excess capacity of the apparatus furnished under this contract, at five dollars ($5.00) per horse power, the contractor furnishing the damper controllers for the additional boilers.
"The contractor agrees as follows, subject to the operation of the equipment as per the instruction of the contractor, to wit: That the material and workmanship of the apparatus furnished under this contract shall be perfect and the contractor will furnish at his own expense any parts which may prove defective within one year from date."

This agreement was never filed or recorded as a mortgage or as a conditional sale.

(2) August 5, 1908, one note was paid in full, and October 5, 1908, $500 was paid on another of said notes and a renewal note of $500 given and accepted for the balance by said Quinn, who had then be-

come the owner of the notes but not of the contract by any written assignment.

(3) October 31, 1908, in the equity suit above entitled, Geo. W. Dunn, Milton De Lano, and Chas. W. Andrews were appointed receivers of all the property, etc., of said company, and seven other allied companies, and the Utica plant and this property came into their possession and has so remained ever since. The receivers were empowered and directed to carry on the business, and they have done so, and this property in question is necessary for the operation of the Utica electrical plant.

(4) In September or October, 1908, and before the appointment of the said receivers, the notes were transferred to John C. Quinn. They had been indorsed by the Engineer Company, but before delivery that company canceled its indorsement. They were transferred and delivered in exchange for some $30,000 of the stock of that company. The contract of sale was not assigned or transferred to Quinn or to any one for him at the time the notes were given in exchange for the stock, and there was no agreement or understanding that it should be.

(5) In 1909 this court made an order directing the receivers to advertise for claims against said Hudson River Electric Power Company and requiring all claims to be presented, and notice was given accordingly.

(6) On or about the 10th day of July, 1909, said John C. Quinn, then the owner of said notes, which he had acquired as aforesaid in payment for said stock, duly presented his claim in writing and under oath to said receivers, the officers of this court, on said notes against said Hudson River Electric Power Company, setting same out as his claim against the said company, stating the amount due and the consideration thereof, and also stating in said claim verified July 10, 1909, as follows:

"That the said notes were duly delivered before maturity to the said John C. Quinn, who is now the owner and holder thereof; that no part of said indebtedness of said twenty-five hundred ($2,500.00) dollars has been paid; that there are no offsets or counterclaims to the same and no judgment has been rendered thereon; and the said John C. Quinn has not nor has any person by his order or to his knowledge or belief for his use had or received any manner of security for said debt whatever."

The said receivers accepted the said claim so presented, and allowed same and acted thereon in making reports to this court, obtaining orders of reference, etc.

(7) Thereafter and in January, 1910, and after the power company had made payments to Quinn on said notes and he had taken a new note of $500 in renewal of the balance of the $1,000 note, one Lezinsky, who had acted for Quinn in getting the notes, obtained for the Engineer Company an assignment as follows:

"In consideration of the sum of one dollar the Engineer Company hereby sells, assigns, transfers and sets over unto John C. Quinn all its right, title and interest in and to all property delivered by it to the Hudson River Electric Power Company in accordance with the terms of a contract between the Engineer Company and the said Hudson River Electric Power Company of which a copy is hereunto annexed and made a part hereof, together with any and all rights and privileges to ask, demand and receive payment for said

property, or to take, receive and reclaim said property and to take any and all proceedings to reclaim said property.

"In witness whereof the Engineer Company has hereunto set its corporate seal and caused the same to be executed by its vice president this 11th day of January, 1910.      The Engineer Company,

"R. E. Fox, Jr., Vice Pres."

That thereafter and in February, 1910, said Quinn filed and served his petition in this proceeding.

(8) The evidence shows that Quinn and the person acting for him in exchanging the stock for the notes did not see this contract or know its contents, and that at the time the exchange was made the Engineer Company did not make its existence or terms known or agree to transfer any such contract. Quinn concedes he knew nothing of it.

(9) I think and hold that the Engineer Company did not agree or intend to assign or transfer the contract to Quinn, or to retain any lien or claim on the property. George Lezinsky, a California lawyer, who did the business, and who was representing himself as the owner of the stock when he was not, says:

"I then negotiated this matter with Mr. McLean on behalf of the Engineer Company which resulted in my turning over to him this stock of the company and received these three notes (the ones in question) as a consideration therefor."

He also says:

"The notes were considered as perfectly good, but at the time the notes were turned over to me, or about to be turned over to me, they bore the indorsement of the Engineer Company, and Mr. McLean said he did not desire to bind the Engineer Company to pay the notes; that I would have to take the notes at my own risk. I said I was quite satisfied to do that and was satisfied to have the indorsement of the Engineer Company which was on those notes cancelled, but that I desired it understood that, although the Engineer Company was not responsible as an indorser on the notes or responsible to me for the notes, I did not want to take them at my own risk. Mr. McLean then told me that all rights and interest of any kind that the Engineer Company had against the Hudson River Electric Power Company would be transferred to me together with these notes, and that the Engineer Company would do all that they could in every way; that I might call upon them to assist in the collection of the notes, if anything of that kind was required, and Mr. McLean said that that was his understanding. That was the understanding between us, but that the Engineer Company itself should not be responsible for the payment of the notes. I took the notes with that understanding and turned over the stock to him, of the Engineer Company. That was in July, 1908. Afterwards I turned the notes over to Mr. Quinn and claimed no interest in them after I turned them over to Mr. Quinn. 1 never did as between Mr. Quinn and myself obtain any substantial interest in the notes."

He also says he had no interest in the stock or notes. He also disagrees with Quinn as to what he told Quinn.

The power company by the receivers insists: (1) That the transfer of the notes by the Engineer Company without an assignment of the contract or the rights of that company under the contract operated to relieve the property from the conditional sale; and (2) that by the presentation of the claim by Quinn and his oath that there was no security he is now estopped from claiming security. I do not believe Lezinsky when he says McLean agreed to transfer to him the contract.

180 F.—15

No excuse for not doing it when the notes were delivered, if it was a part of the agreement of transfer, is given. His story on this point is not consistent ·or probable. But subsequently the Engineer Company did transfer the contract to Quinn. Can he enforce it as against this property? Is the title of the property in him? When the Engineer Company sold the notes and Quinn bought them he did not purchase the property or the interest the Engineer Company had therein. Having sold the notes without transferring the contract or its rights under it, did the Engineer Company have any claim on the property which it could subsequently transfer for $1 to Quinn?

I do not think the time or date when the assignment of the contract was made is material, provided it was agreed that the contract should be assigned with the notes to Quinn or for his benefit. The claim on the property, the retention of title by the Engineer Company, was in the nature of collateral security for the payment of the debt.

In Stillman v. Northrup et al., 109 N. Y. 473, 481, 482, 17 N. E. 379, a bond and mortgage was executed and delivered. The mortgage was, of course, security for the bond. The mortgagee assigned the bond and mortgage to one N., and in the assignment guaranteed the payment of the mortgage to N., but did not guarantee the payment of the bond. Thereafter N. assigned the bond and mortgage, but did not assign the guaranty. The Court of Appeals held that it was evidently the intent to guarantee the payment of the bond, or debt, as well as the mortgage, and that the guaranty so operated, and also that the assignment operated to assign the guaranty which was subsequently done, and also:

"But it is well settled that the assignment of a bond and mortgage carries with it the guaranty of payment or collection although not mentioned in the assignment. Craig v. Parkis, 40 N. Y. 181 [100 Am. Dec. 469]. The transfer of the debt to the plaintiff carried with it, as incident thereto, all the securities for its payment."

Treating the contract so far as it retained title to the property as a collateral security for the payment of the notes, the mere transfer of the notes carried the collateral. But this contract contained other provisions obligatory on both the Engineer Company and the power company at the time the notes were transferred to Quinn, as before recited. It is evident from the testimony that there was no agreement to transfer the contract as such and as a whole and impose its obligations on Quinn, or any intent on his part to assume it or its obligations. The subsequent absolute·assignment of the contract was not therefore in execution of any agreement, express or implied, made as part of the agreement for transferring the notes and debt represented thereby. If the rule is applicable here that the transfer of notes carries the collateral, and it is held that the contract so far as it reserved title was collateral, and that it passed as an incident of the debt represented by the notes to that extent, and so carried title to such property to Quinn, it must be so held because the law so operated, and not because of any express agreement to that effect. In Winstead v. Bingham (C. C.) 14 Fed. 1, 2, the court said, holding that the transfer

of a note, the payment of which was secured by a mortgage on real estate, carried the mortgage although there was no assignment thereof:

"At common law and in equity it is well settled that the incidents follow the principal, and that the transfer of a note secured by a mortgage carries with it the mortgage security; so that the transfer by delivery of a note payable to bearer will transfer the mortgage given to secure the note."

When the notes in question were transferred to Quinn, neither he nor Lezinsky knew of the existence of this contract reserving title. Quinn knew nothing of it, but Lezinsky knew generally that the Engineer Company had printed contracts which it used in making such sales containing this clause and assumed there was such a contract in this case. No representation was made that such a contract existed. But if the contract was a collateral security for the notes, and such a security passes on the transfer of the notes, it would seem to be immaterial that Quinn did not know the contract was in existence. There is respectable authority to the effect that the assignee of a debt

"—is entitled to the benefit of all collaterals received by the creditor, although he did not originally rely upon them, or know of their existence, and is entitled in equity to the benefit thereof as against B. who surrendered the same to A. without his knowledge or consent. Vail v. Foster, 4 N. Y. 312; Higgins v. Wright, 43 Barb. [N. Y.] 461; Merchants' & Mfrs.' Bank v. Cumings, 149 N. Y. 364 [44 N. E. 173]; Cowen's Treatise, vol. 1 (5th Ed.) § 457."

But it is claimed that the Engineer Company abandoned its security or claim on the property. I really find no evidence of such an abandonment unless it results from the fact that it severed the notes from this contract and sold the notes independent thereof and by canceling its indorsement and holding the contract may be said to have abandoned or released all claim to the property itself. When Quinn took the notes, there was no default, and no right existed to take the property; but I cannot see that this makes any difference here. If the retention of title in the nature of a lien on the property as security for the debt was in fact collateral security, I do not see, on principle, how it can be held in face of the authorities that the lien or security did not pass to Quinn.

This position finds strong support in Esty v. Graham, 46 N. H. 169, 170; Rigney v. Lovejoy, 13 N. H. 247; Ross-Meehan Co. v. Ice Co., 72 Miss. 608, 18 South. 364; McPherson v. Lumber Co., 70 Miss. 649, 12 South. 857; Cutting v. Whittemore, 72 N. H. 107, 110, 54 Atl. 1098; Williston on Sales, p. 522, § 332; Little Rock v. Collins, 66 Ark. 240, 50 S. W. 694; Townsend v. Southern Pac. Co., 127 Ga. 342, 56 S. E. 436, 119 Am. St. Rep. 340. In Cutting v. Whittemore, supra, at page 110 of 72 N. H., at page 1099 of 54 Atl., the court says:

"It has been decided in this state that a vendor who sells a chattel reserving the title until the purchase price is paid retains the general property therein, not as the absolute owner, but as collateral security, not differing materially from security by way of mortgage or other lien, and that a transfer of the debt carries with it, as an incident, his interest in the chattel, in the same manner as the assignment of a mortgage debt would carry with it the mortgage."

Cases are cited to sustain the contention. Williston on Sales states the same rule.

In some of the cases the note transferred in and of itself reserves title to the property in payment for which it was given. In such a case there would be no question, it seems to me, that the transfer of the note would carry with it the contract reserving the title in the property, and hence carry the interest of the vendor of the chattel in the chattel to the purchaser of the note. My attention has not been called to but one case holding the contrary. Domestic Sewing Machine Co. v. Arthurhultz, 63 Ind. 322.

I think the view I have taken is also sustained by the Court of Appeals in Merchants' & Manufacturers' National Bank v. Cummings, 149 N. Y. 360, 44 N. E. 173. The question is not free from doubt; but it seems to me but just that the purchaser of the notes in question for a valuable consideration should have the benefit of the security held by the Engineer Company in view of the fact that that company subsequently actually assigned its interest in the property to Quinn. It is of course true that, if the Engineer Company actually abandoned its lien and claim upon the property when it assigned the notes to Quinn without transferring its interest in the property, the lien was extinguished and could not thereafter be revived by an assignment of the contract. But I find no evidence that the Engineer Company intended to abandon the lien and did abandon it before passing the notes to Quinn.. If the contract retaining title was a collateral security for the notes and passed with the notes as an incident thereto, in so far as title to the property was retained as security, then, in the absence of some agreement or other affirmative action on the part of the Engineer Company, it seems to me that Quinn took title as collateral security, even though he was ignorant at the time of the agreement between the Engineer Company and the power company.

The general trend of the cases is to apply equitable rules in such a case and give the purchaser of the debt for a consideration all the collateral security which the original holder of the note held for its payment.

I am therefore compelled to hold that Quinn has a lien on this property for the amount of the notes. I do not think that Quinn is estopped from asserting his lien at this stage for the reason he filed a claim stating he had no security, when he in fact did but was ignorant thereof. The situation of the parties has not been changed for the worse in reliance thereon. The receivers are instructed to pay the $2,500, and interest at the rate of $250 per month commencing August 1, 1910. They will also pay the charges and expenses of the special master fixed and allowed at $164.83.

So ordered.