## BUTTON et al. v. CITIES FUEL & POWER CO. *

## CITIES FUEL & POWER CO. v. EMPIRE TRANSPORTATION & OIL CORPORATION.

(Circuit Court of Appeals, Fourth Circuit. May 14, 1924.)

No. 2125.

**1. Corporations ⬅552—Suit for receivership held fraudulent.**

A suit against a corporation, in which it immediately filed an answer, without any action having been taken by its directors consenting to the appointment of receivers *held* to have been fraudulently brought in the interest of a firm which fully controlled complainant corporation, to which it caused to be transferred the notes of defendant on which the suit was based, and which was also a stockholder of defendant and in full control of its affairs and those of its subsidiaries, through the right, given it by a contract, to vote stock which it did not own; the purpose of the suit being to enable it to retain such control as against practically all the other stockholders, with whom a controversy had arisen over its management.

**2. Corporations ⬅560(4)—Duty of receivers to take charge of subsidiary companies.**

It was the duty of receivers appointed for a corporation which owned the stock of subsidiary companies to take charge of the business of such subsidiaries, and their continued control and management by their then officers and directors, all of whom were either members or employees of the firm which was the real complainant in the receivership suit, was illegal and fraudulent.

**3. Corporations ⬅76—Contract to purchase stock held enforceable.**

A contract by which a firm which lent money to a corporation agreed to purchase a certain amount of the stock of the corporation at a stated price, at such times as the money was needed to pay interest on the loan, *held* not to have been canceled or surrendered by consent of the corporation and to be still binding and enforceable.

**4. Corporations ⬅560(5)—Sale of property in receivership suit held in violation of rights of stockholders.**

Where a firm, which, through a contract giving it the right to vote stock of a corporation which it had an option to buy, had control of the corporation and its several subsidiary companies, whose officers and a. majority of whose directors were members or employees of the firm, continued such control of the subsidiaries during a receivership for the principal corporation, and caused them to enter into contracts detrimental to their interests, and which affected the value of their property, with other corporations which it owned, other stockholders of the holding corporation had the right to have such contracts investigated and set aside before a sale of the property of such corporation, including the stock of the subsidiaries in the receivership suit, in which the firm was in fact the complainant, and which was instituted to enable it to acquire the properties.

**5. Corporations ⬅561(3)—Corporation held liable for expenditures made by third parties, under illegal contracts, in so far as it was benefited thereby.**

Where the real complainant in a receivership suit against a corporation, through its control of subsidiaries of defendant caused them to enter into illegal contracts with other corporations owned by it, on the setting aside of such contracts, expenditures made by third persons in reliance thereon are chargeable to defendant, so far as they were of benefit to it or its properties, but no further.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 266 U. S. ——, 45 Sup. Ct. 99, 69 L. Ed. ——.

Appeals from the District Court of the United States for the Eastern District of Virginia, at Richmond; Edmund Waddill, Jr., and D. Lawrence Groner, Judges.

Suit in equity by the Cities Fuel & Power Company against the Empire Transportation & Oil Corporation, wherein Joseph Button and others intervened. Interveners appeal from a decree confirming sale of property of defendant. Reversed.

See, also, 300 Fed. 301.

Charles A. Douglas, of Washington, D. C., and Lewis C. Williams, of Richmond, Va. (Hugh H. Obear, of Washington, D. C., Benjamin V. Becker, of Chicago, Ill., Williams & Mullen, of Richmond, Va., Levinson, Becker, Schwartz & Frank, of Chicago, Ill., and Douglas, Obear & Douglas, of Washington, D. C., on the brief), for appellants.

Thomas B. Gay and Henry W. Anderson, both of Richmond, Va. (Munford, Hunton, Williams & Anderson, of Richmond, Va., Frueauff, Robinson & Sloan and Watson B. Robinson, all of New York City, on the brief), for appellee.

Before WOODS and ROSE, Circuit Judges, and WEBB, District Judge.

ROSE, Circuit Judge. The appellants are stockholders in the Empire Transportation & Oil Corporation, a body corporate of Virginia. They intervened in an equity cause in which the Cities Fuel & Power Company, a Delaware corporation, figured as plaintiff and the company in which they held stock was defendant. They will be called the interveners. They assert that the litigation to which, for the protection of their interests, they became parties, was instigated by Henry L. Doherty and Frank W. Frueauff, copartners trading as Henry L. Doherty & Co. For brevity, this firm and its members will be referred to as Doherty, in the singular and by the neuter pronoun. It was itself a large stockholder in the defendant. The interveners say that it procured the filing of the bill in this cause in furtherance of a scheme to defraud its fellow stockholders, and that the plot culminated in the sale of defendant's properties under the decrees here under review.

The defendant was in theory a stockholding and not an operating company. Its assets consisted either of all or of the larger part of the capital stock of eight other corporations. Two of these, the Holden Evans Steamship Company and the John M. Connelly Steamship Company, held Delaware charters. When it is necessary to refer to them, they will be styled the Evans and the Connelly, respectively. The holdings of the defendant in them seemed to have been acquired some time after it was organized. It was in the first instance formed to take control of the other six companies now owned by it. Two of them were incorporated in Delaware, one in Virginia, one in West Virginia, and two in the republic of Mexico. They were the National Petroleum Corporation, the Gulf Coast Corporation, the Southern Fuel & Refining Company, the La Guanita Oil Company, the Tampascas Oil Company, and the Empire Pipe Line Company. They will be spoken of as the National, the Gulf, the Southern, the La Guanita, the Tampascas, and the Pipe Line, respectively.

In 1916, they owned among them Mexican oil lands or leases thereof, terminals in Mexico and in this country, pipe lines, and floating equipment as well as other property. At that time all or the larger part of the stock in every one of them was held directly or indirectly by one or the other of two groups into which the present interveners and their predecessors in title were then divided. It appeared to these groups that the properties could be operated to better advantage if they were brought under one control. They interested Doherty in a plan by which this could be done, and in December, 1916, they made a written agreement with it for carrying the project into effect.

By this contract provision was made for the formation of a new company which should acquire all or the greater part of the stock of the six then existing companies and certain interests in other properties at the time owned by Payne, one of the interveners herein. What name the new creation was to bear or the state by which it was to be brought into being were details to be subsequently settled. The contract provided what the new company was to get and what it was to give, and what Doherty was to do and what that firm's pay was to be. It was recognized that in order to acquire the properties and to provide working capital $2,000,000 of cash would be presently needed. This sum was to be borrowed, but as it was more than possible that it would be some time before the new concern would be in position to repay a loan of that size, or even to meet the interest thereon, it was arranged that five years should elapse before its current revenues would be called upon to provide for either. The new company was to have a capital of $15,000,000, to be represented by 150,000 shares, of the par value of $100 each, but only 120,000 were for the time being to be even so much as nominally issued. If all the stocks and all Payne's interests embraced in the scheme were actually acquired, the company was to pay for them 42,500 shares of stock and $1,303,000 in cash, the latter to come out of the $2,000,000 the company was to borrow.

In point of fact some of the stock and some of the properties were not transferred, and in consequence the shares issued in return numbered but 34,348.65, while the cash payment was $851,129.60. The remaining 8,151.35 shares of the total of 42,500 originally set aside for this purpose are, together with the 30,000 already mentioned, still in the defendant's treasury. Doherty was to lend the new company $2,000,000, for which it was to give its six-months note with interest at the rate of 8 per cent. per annum; but Doherty agreed that this note and its successors should be renewed from time to time, so that it would be five years before payment could be required. At 8 per cent. each semiannual interest payment would be $80,000. For the entire period of the loan the interest charge would aggregate $800,000, of which $720,000 would be payable before the five years had run their course. To meet this large sum without drawing upon the working capital of the company there was inserted in the agreement a provision that Doherty "agrees and has the right to purchase such amount of the $2,000,000" treasury stock "at $37.50 per share as shall be required to put the new company in funds to pay interest on the loan." Twenty

thousand shares at $37.50 per share would have brought into the company's treasury $750,000, so that all the interest to fall due before the expiration of the five years during which the loan was to run, as well as $30,000 of the $80,000 installment to be paid at the end of that time, was thus secured.

It was further provided that Doherty "will take care of current operating expenses of all companies after December 15, 1916." "But it is understood and agreed that at the time all the companies' properties involved in this plan are to be absolutely free and clear of debt, with the exception of the La Guanita Company, which has commitments for current expenses not to exceed $6,000. This will be taken care of by" Doherty "up to said amount." The language employed was vague, but the most reasonable construction to be put upon it is that it had reference merely to the interval between December 15, 1916, and the date at which the control of the old companies would be taken over by the new. Doherty was to have the option for four years of purchasing 27,500 shares at $73 per share, and during that time was to have the right to vote it. This option was never exercised.

In addition to the 20,000 shares, Doherty agreed to buy and the 27,500 it might buy if it would, it was to receive 30,000 more, apparently as compensation for what it bound itself to do or for the advantages that the other promoters of the new company thought the latter would get from connection with that firm. For these 30,000 Doherty was to pay nothing, either in money or in property. It was necessary that the legal status of full-paid shares should be given to them, as well as to the 20,000 shares Doherty was to buy and to the 27,500 it had the option of purchasing. For this purpose, the stocks and properties to be acquired by the company were to be offered to it in return for $1,303,000 cash and 120,000 shares of its stock, with the proviso already mentioned for a proportionate reduction in case of short delivery. It follows, from what has been said, that the stock nominally issued was 111,848.65 shares, but the lapsing of the Doherty option on 27,500 of these reduced the amount to 84,348.65, of which 34,348.65 were issued to the former holders of the stock or other properties acquired by the defendant and 30,000 to Doherty for services. The remaining 20,000, as already stated, were to be sold to Doherty at $37.50 per share, in order that out of the proceeds the interest on the $2,000,000 loan should be paid. Usually when, under conditions similar to those here existing, the shares which are to be disposed of for the company's benefit at a price under par have been thus technically paid for in full, the person to whom they are in the first instance formally issued gives them back to the company's treasury. An entry in the books kept by Doherty's employees recites that such donation was, in this instance, made.

The defendant was incorporated on February 8, 1917. It then became necessary that the bargain contemplated in the agreement of December should be made with this new legal entity. Accordingly, one Coleman, an employee of Doherty, made a written offer to the directors of the defendant to convey to them the stock and properties for 11,990 shares of defendant's stock and $1,304,000 in cash, with the

proviso that, if he failed to deliver all he offered, he was to get ratably less. Naturally and properly this proposition did not have anything to say as to what was to be done with the 11,990 shares when issued to him, but there was nothing in it which in the slightest degree hinted that there had been any alteration in the terms previously agreed upon, and no witness undertakes to say that any such change was ever made or suggested. The only respect in which Coleman's proposition departed from the December undertaking was that the number of shares to be issued was 11,990, instead of 12,000, and the cash was to be $1,-304,000, instead of $1,303,000. The explanation was that, before there could be anybody authorized to accept Coleman's offer, a few shares had to be put out. Ten of them were subscribed for by and were issued to Doherty's nominees, and the $1,000 paid for them was returned through the increase of a like amount in the cash payment to be made by the defendant. On March 27, 1917, the proposition was finally accepted, and at that time there can be no question that everybody concerned understood that the defendant became entitled to all the benefits which the agreements of the previous December intended to confer upon it. Thereafter the control of the defendant, and through it of all its subsidiary companies, was absolutely in Doherty's hands, although the intervener Payne continued for some years to be a salaried officer of the defendant, and for some part of the time one McDowell, whose sympathies ultimately came to be with the interveners, was one of Doherty's employees in special charge of defendant's operations. Doherty's men filled nearly all the directorships of the defendant and its subsidiary companies and were their titular officers.

For some years there was no public protest against the way in which the companies were run. Doubtless, as Payne now testifies, there were times when he thought that things which should be done were left undone, and he was perhaps becoming increasingly dissatisfied with the difficulty he experienced in securing action on what seemed to him to be important matters, or even in having them adequately considered. When he brought such questions up with such of the Doherty organization as figured as officers of the defendant or its controlled companies, he was told that he knew that they must be passed upon by Henry L. Doherty personally, and it was, he says, often impossible for weeks together to obtain an interview with that gentleman. Some witnesses still connected with the Doherty organization say there was no foundation for these complaints. Whatever the truth may be as to them, it is certain that Payne did not until some time in 1920 put himself upon record as absolutely opposed either to what was being done or to the way of doing it.

In the meanwhile the defendant and the companies owned by it had not prospered. They had their full share of those troubles with the public authorities and with private individuals which are said frequently to attend oil developments and operations in Mexico, and which are probably not unknown elsewhere. Serious and difficult questions of title were raised. They encountered many sorts of obstacles and delays, some physical, such as the intrusion of salt water into the oil fields; others were due to the actions of outside persons, some in public

office and some in private station. The defendant had invested much money in the steamships Holden Evans and John M. Connelly, and apparently stood to lose almost all of it. Some of the defendant's subsidiary companies might be making a little money, but as a whole the venture was a losing one. Under such circumstances differences of opinion were to be expected. To the present interveners it appeared that Doherty had complete control and had confessedly failed to get results. Such of them as had been in close touch with the properties still believed they could be made profitable, if more money was promptly put into them. Unfortunately, those who were of this way of thinking either had no money or, if they had, did not want to use it in defendant's business. On the other hand, any expectation that Doherty originally may have had as to the possibility of profits at once large and quick had been disappointed. Putting up more money for the defendant, even at the liberal rate of 8 per cent. per annum, no longer seemed attractive. Both principal and interest might be lost. If there was still a reasonable chance of getting a handsome profit, as Doherty as well as the interveners seem still to have thought, that firm admits that it was no longer willing that its associates should share in the gains. From the Doherty standpoint, if the interveners did not help to supply the needed funds, they were not entitled to share in the resulting gains.

This point of view was natural enough, but, in the relation in which Doherty stood to the other stockholders, nothing should have been done towards giving it effect until they had been told with the uttermost frankness and fullness what the exigencies were and in what way Doherty proposed to deal with them. Unfortunately, the opposite course was taken. There is no evidence in the record of any attempt on Doherty's part to call the attention of the stockholders to the precise things which were needed, or to discuss with them the way of providing for such requirements. What was done was very different. Doherty organized new companies, all the stock of which belonged to that firm. To these new creations it caused to be conveyed properties absolutely essential to the successful operation of some of defendant's subsidiaries, or which in one case were certain to be highly profitable; this, too, when the negotiations for such properties had in some, if not all, cases been conducted in the names of such subsidiaries. No report of these proceedings were ever made to the stockholders of the defendant. When Payne found out that one extremely valuable property had been taken over by one of these Doherty companies, he was indignant, gave up the position and salary of $6,000 per annum which he had held in connection with defendant, informed his fellow stockholders of what he knew, and apparently of much that he merely suspected. They promptly acted by demanding an opportunity to examine the books and accounts of the defendant and its subsidiaries. Doherty, while at times giving an apparent assent, in the end prevented the making of such examination. The dates here are important. The demand was first made on November 13, 1920. It was verbally refused on December 6 of the same year. The refusal was repeated in writing on December 17, although Doherty had been told as early as

the 6th that its attitude was an invitation to litigation. On December 31, Doherty caused no less than four of defendant's subsidiaries to enter into contracts of the most far-reaching importance with one or the other of two Doherty-owned companies.

The interveners believe these contracts to be unfair to the defendant's subsidiaries, and there can be no question that they deprive the latter of the control of much of their business. At least one subsidiary, which Doherty caused to enter into one of these contracts, had been conducting its business at a profit, and in its case at least, and from its standpoint, it is difficult to discover any occasion for making any such bargain as Doherty made for it. We do not find it, however, necessary to analyze any of these agreements. The time at which they were made and the circumstances surrounding their making were, as the court below held, such that they cannot be allowed to stand. At the time Doherty caused them to be entered into, he knew that the other stockholders in defendant were profoundly dissatisfied with the way in which it and its subsidiaries had been managed, that they felt that Doherty was keeping from them information to which they were entitled, and that in all probability they were about to seek the aid of the courts. Payne, one of the interveners, was still a director of some of the subsidiaries which purported to enter into these contracts; Hull, another intervener, of others. Neither of them were given any notice of the special directors' meetings at which these contracts were authorized, and in point of fact knew nothing of them at that time or for months afterwards. All the directors, other than members of the Doherty firm, who took part in approving them, were mere employees of Doherty and had not one cent of personal pecuniary interest in the companies for which they assumed to act.

After receiving, on December 17, Doherty's final refusal to permit an examination of the books of the defendant and its subsidiaries, the interveners decided to call a special stockholders' meeting, as under the laws of Virginia the holders of 10 per cent. or more of the stock might do. The call, which was quite an elaborate one, was prepared and signed by stockholders having the requisite amount of stock. It was dated January 5, 1921, and fixed the meeting for February 3. Which side would poll the majority of the votes at the meeting now became of first importance. Doherty had the 29,990 shares originally given in return for what it had undertaken to do, and presumably the 10 other shares for which its nominees had then subscribed, although for some reason only 7 of them were represented at the meeting of February 3. It does not appear that then or since any other stockholders were willing to vote with Doherty. The shares issued in payment for the stocks and properties acquired by the defendant aggregated 34,348.65. Doubtless at that time it was difficult or impossible for Doherty to find out how many of them would be represented at the meeting. It was quite possible that more than 30,000 might be. Indeed 30,100 shares subsequently united in the petition of intervention.

The agreement which resulted in the formation of the company gave Doherty for 4 years an option on 27,500 shares at $73 per share,

and the right during that time to vote the stock. There might be a question as to the date from which the 4 years should be counted. It would have been quite possible to contend that the option would not expire until a few days or weeks later; but such a contention, if sustained, might have worked to Doherty's hurt. When that stock was issued, Doherty had caused it to be put in the names of five voting trustees, four of whom were then members of its firm or in its employ, or in that of companies controlled by it. Two of these had before January 1, 1921, severed their connection with it, and were in sympathy with the fifth trustee, who was in opposition to it. If this stock was entitled to vote, it doubtless would be voted against Doherty. The petition of intervention charged that Doherty, to maintain its hold upon the defendant, so manipulated the records of the latter as under the rulings of the presiding officer to retain control of the meeting, and it specified that the omission of those 27,500 shares from the list of those entitled to vote was one of the improper things done to that end. Under the law of Virginia and the by-laws of defendant, the secretary made up and certified a list of stockholders and the number of shares held by them. The by-laws authorized the chairman of the meeting to appoint two inspectors of election, and declared they were authorized to decide all questions, such as the qualification of votes and the validity of proxies, and the acceptance or rejection of votes. The interveners have proved that the secretary, who made up the list of stockholders, was a Doherty employee, its chairman was a member of the Doherty firm, and the two inspectors appointed by him were one of them its employee and the other of the counsel to whom it had furnished proxies to qualify them to take part in the proceedings; but they have failed to show that the 27,500 shares should have been permitted to vote. The ruling excluding these shares was in our judgment right. Doherty had the right, if it wished, to surrender its option before the 4 years had expired. In the financial situation in which it was to Doherty's interest to insist that the defendant stood, there was no possibility that within the next 50 days any one would want to pay $73 a share for its stock.

The only other stock which had been ever formally issued was the 20,000 shares, which in accordance with the agreement in pursuance of which defendant was afterwards organized were to be turned back into its treasury and subsequently bought by Doherty for $37.50 a share as funds were required to meet the installments of interest on the $2,000,000 loan. Doherty had never paid for a single share of them, and throughout this litigation has always insisted that it was under no obligation to do so. So long as they were in the company's treasury unpaid for, no one had the right to vote them. The facts being as they were, for Doherty to use them to insure his control of the company was nothing short of a fraud on its part. Yet that was precisely what was done.

The secretary included in the certified list of stockholders the name of Coleman as the holder of 20,000 shares, and the inspectors held that under section 3799 of the Code of Virginia his action was conclusive upon them and upon the meeting. Coleman was, it will be remem-

bered, the particular employee of Doherty who had four years earlier been selected to make the formal offer to the defendant to exchange the control of what became its subsidiaries and certain other property for the shares of its stock and a certain amount of cash. His name was used in the paper as any one else's might have been. He never had any personal interest, either in what he was offering to sell or in that which he proposed to buy. He was examined as a witness in this case. He swore that, although he had given a proxy for this stock, he did not know to whom or whether it was ever used or not. In point of fact, when presented to the meeting, it purported to be issued to Frank W. Frueauff, one of the two partners in the Doherty concern. As already stated, an entry on defendant's books showed that these shares had been donated to it, as by the terms of the agreement they should have been. The only pretext for voting them was that, by accident or design, the certificate for them originally issued to Coleman had never been formally canceled, and they still stood in his name. The assertion that Frueauff, knowing these facts, was justified in voting them, requires neither answer nor comment. The name of one who is not entitled to vote may by some fraud, mistake, or oversight get upon the registry lists of his precinct. The law of the state may, so far as the judges of election are concerned, make its presence there conclusive evidence of his right to vote; but if he knows that he is not entitled to cast a ballot, and nevertheless does so, he will in morals and perhaps in law be guilty of fraudulent voting. Objection after objection was made to the voting of this stock by those who were opposed to Doherty. They demanded to know whether Doherty or any one else had ever paid for it, and they asked who claimed to own it; but, beyond the assertion that it stood in Coleman's name upon the stock list, they could learn nothing; nevertheless voted it was. As it turned out, Doherty would have controlled the meeting, had it refrained from voting these shares. Vanderbilt, one of the interveners, was at the time out of the country, and a formal proxy from him could not be obtained in time. At the meeting the greatest number of shares voted against Doherty was 28,437.98, and it had the unquestioned right to vote 29,997.

The voting of the 20,000 shares is, however, something which may not be passed over lightly. It strengthened the conviction of those who are now the interveners that their opponents were hampered with few scruples, and thus made sharper the conflict that has since been waged. At the meeting Doherty made no objection to a resolution authorizing any group of stockholders to examine the books, records, and properties of the company and its subsidiaries, but voted down another which appointed a committee to make such examination at the expense of the company, and as a matter of course one which directed that a suit should be brought against Doherty for the mismanagement of the properties. When the meeting adjourned, Doherty was still in the saddle, but it was obvious that, if things were allowed to take their normal course, it might not long continue to be. Another meeting could be called, and before it convened steps to prevent the voting of the 20,000 shares would doubtless be taken. Vanderbilt's and perhaps other proxies might reach the opposition, and in that event the control

of the defendant and its subsidiaries would pass into other hands. This Doherty determined to prevent. It decided to use its domination of a large creditor of the defendant to put the latter into receiver's hands. As this creditor and the officers still in charge of the defendant would act in obedience to Doherty's wishes, in the first stages of the litigation there would be no contest, with whatever advantages of position that under such circumstances might result to it.

[1] Doherty moved quickly. The stockholders' meeting was held on Thursday, February 3. Five days later, on Tuesday, February 8, the bill of complaint was filed in the instant cause. The nominal complainant was the Cities Fuel & Power Company. It turns out that it was but a mere name under which another corporation, the Cities Service Company, conducted a part of its business. The latter owned all of complainant's stock, although, in accordance with the usual practice in like cases, a few shares were kept in other names for the purpose of qualifying directors. The complainant had the semblance of an organization, but that amounted to so little in practice that when its president, one Lehrer, an employee of Doherty, was examined as a witness, he did not know who his fellow officers and directors were, and yet his company was supposed to have bought $4,000,000 of defendant's notes. It filed its bill on behalf of itself and the other creditors of the defendant. The latter was described as a holding company. The bill stated the number of shares defendant held in each of its subsidiaries, and that they in the aggregate were indebted to it in the sum of about $1,400,000, and that they had been and were being operated as one general system. It set forth that complainant was the holder of a demand note of defendant for $2,000,000 with interest thereon at 8 per cent. per annum from the 31st of the preceding October, and also of another note for a like amount maturing May 1, 1921. Although the bill did not say so, this latter was for the $2,000,000 originally loaned by Doherty, and which that firm was obligated to carry for a year or more after February 8, 1921. It was alleged that the defendant owed other large amounts and was hopelessly insolvent. In order to prevent great sacrifice of values, it was said the subsidiaries must be operated under a unified control. The usual prayer for process and the appointment of receivers, and for an injunction to prevent interference with them, followed.

Although one of the counsel who filed this bill has since put upon record that it was only upon the presentation for adoption of a resolution authorizing litigation with Doherty that defendant was put in the hands of receivers, the bill did not disclose that such was the real motive for the application to the court, nor was there any suggestion in it that there was any dissension whatever among the defendant's stockholders. While the counsel whose signatures were affixed to the bill had at Doherty's instance taken part in the stockholders' meeting, they do not appear to have been in any sense its general counsel. Doubtless they were employed for the purposes of this controversy only, and in all probability at the time knew little of what has since been revealed as to the past history of the defendant, or of the relations between it on the one side and Doherty and Doherty's other com-

panies on the other. In a bill which they were instructed to file on behalf of a corporation to which they were told the defendant owed far more than it could pay, no matter who had charge of its affairs, they may have assumed naturally enough that anything in reference to disputes among the latter's stockholders would be out of place. Under the circumstances as they at the time understood them to be, a receivership might well have seemed unavoidable, and they may have thought there was no occasion to notify the dissenting stockholders that one was to be asked for. Nevertheless, in our view, such notice should have been given.

The equity rules gave the defendant 20 days in which to answer. There was no occasion for any haste upon its part, yet simultaneously with the filing of the bill and without any meeting of its board of directors, still less without any consultation, formal or informal, with its stockholders, it put in an answer admitting complainant's allegations and consenting to the relief requested. Again, so far as the record tells, there was absolute silence as to what was going on in the defendant. There was nothing to show that the whole proceeding had its origin in a bitter controversy among defendant's stockholders, and in which there was about equal strength on each side. It may very well be that counsel who filed the answer for defendant may himself have known nothing of this phase of the matter. He may have been merely employed by the officers of the defendant to take the action he did, and may have assumed without inquiry that they were fully authorized to instruct him in the premises. It still remains true, when the court was called upon to act, it was not aware of many things which had happened, and which before making his decree any chancellor would have wanted to know. As a result, receivers were appointed before the stockholders who were opposed to Doherty knew that they had been asked for. One of the gentlemen named as such was an employee of Doherty, and the other a highly respected citizen of Richmond not in any wise identified with any of the parties to the controversy. The decree gave the defendant until February 28 to show cause why the restraining order and the receivership should not be made permanent, and allowed it to move for a still earlier modification upon 10 days' notice to the complainant; but under the peculiar circumstances of this case such provision proved of little practical value. The decree in most respects followed approved forms, and authorized the receivers to take full control of the defendant, and that they should do so was undoubtedly the intention of the court.

[2] The decree, however, contained one provision which as incorrectly construed by the receivers reduced them to little more than figureheads. It directed them "to continue in the operation of any of the properties of said corporation which now may and at the time of the appointment of the receivers be operated by it, and to conduct the business of the said corporation as the same was or is being conducted at the time of the appointment of said receivers." The receivers understood this language to require them to allow the subsidiary companies to be managed and operated, not only in the same way, but by the same directors who had conducted them in the past; that is, in effect by Doherty, without control, interference, or suggestion from

the receivers. So far was this policy carried that during the receivership some of the interveners, who had constituted the minority of the board of directors of some of these subsidiary companies, were replaced by Doherty's men without the receivers making any objection, and quite possibly without one of them knowing anything about it.

During the almost two years of the receivership, the only money which came into the possession of the receivers was one draft for $2,500 and the sum of $5,000, which the court authorized them to borrow on their certificates, and immediately to pay out. During the same period upwards of $1,000,000 of the money of the subsidiary companies passed through Doherty's hands. These subsidiaries, or some of them, during this time entered into important contracts, as to the wisdom of which, it is quite possible that there might be two opinions; but the receivers were seldom, if ever, consulted about them, nor was the approval of the court either asked or obtained. During the course of taking testimony in this case, the counsel for the complainant and for the receivers, repeatedly called attention to the circumstance that the receivers of the defendant were not the receivers of these distinct legal entities, the subsidiaries. True, but unimportant. As receivers of the defendant, they held all of the stock of some of the subsidiaries and the overwhelming majority of that of the others. At any time they could have legally and properly taken control of any one of them. The bill of complaint rested the necessity for the receivership largely upon the assertion that unified control was necessary, and yet the receivers never exercised or attempted to exercise any control at all. Doherty, after the receivership, ruled them precisely as it had done before. In contrast with the suggestions counsel for the complainant made to the special master, to the effect that each subsidiary was a creation so separate from the others and from the defendant that the receivers had scarcely any duties or responsibility concerning any of them, Doherty treated them all as one, in that it assumed the right to apply any moneys one of them might put into its hands to any indebtedness any of the others might at the time owe it.

By the 17th of February the interveners, or some of them, had learned of what had been done, and on that day the intervener Yoakum wired Frueauff, one of the Doherty firm and the president of the defendant, demanding that the defendant's directors be convened to order the withdrawal of the answer already filed and to substitute for it one denying the material allegations of the bill, and on the 19th the intervener Payne, as a director and vice president, in writing repeated the demand. The meeting was duly called for the 21st, but at that time Payne's wife was ill and he was unable to attend. The other directors, who were all either members of the Doherty firm or employees of it, ratified the action of the officers of the company in filing the answer, and to make assurance doubly sure gave a power of attorney to the solicitor who had filed the answer, empowering him to appear for the defendant and confess judgment upon the demand note for $2,000,000 held by the complainant in the equity cause. Three days later the Cities Fuel & Power Company, on the law side of the court below, brought suit upon that note. Defendant's solicitor at once appeared and confessed judgment, which was duly entered up. On the

26th the plaintiff filed a supplemental bill, setting forth, among other things, the judgment obtained on the 23d and that, as the receivers had previously taken possession of all the property of the defendant, there was nothing upon which execution could be levied. On the same day defendant answered the supplemental bill and admitted the truth of its allegations. On the 28th the court continued the receivership and the injunction until further order. On the 2d of March the interveners asked leave to intervene. On June 8th permission was given them to do so.

Then a petition of intervention was at once filed, and on June 22, two weeks later, was followed by the interveners' answer to the original bill. Both these papers went over pretty much the same ground and in large part were verbally identical. In each of them the interveners on knowledge and belief charged that Doherty had conspired to wreck the defendant and its subsidiaries, with the intent and purpose of destroying utterly the interests of its stockholders and of ultimately acquiring without consideration and by fraudulent and illegal means all of its oil properties for its own selfish uses and purposes. It was alleged and subsequently proved that Doherty controlled the nominal plaintiff as well as the defendant. Each of them had nine directors, of which eight were in each case employees of Doherty; four of them served on both boards. Another one of defendant's directors was also its treasurer, and he was besides treasurer of the plaintiff, although he was not on the latter's board. In addition, defendant's assistant secretary was at once secretary and a director of the plaintiff.

The interveners asserted that in every true sense the real plaintiff was Doherty, and not the company in whose name the suit was brought. Many of the facts already stated in this opinion were set forth as tending in the interveners' opinion to show that defendant's assets had been and were being appropriated to Doherty's use, and that Doherty had resorted to many devices to prevent any effective inquiry into its doings. The interveners said that Doherty was bound to take and pay $37.50 per share for the 20,000 shares of stock as the full $750,000 which would thus have come to the defendant's treasury had been or would be required to meet the interest on the $2,000,000 loan. The interveners alleged that any financial embarrassment in which defendant might seem to be was the result of the failure of Doherty to do what it should and of its doing what it had no right to do. It should have bought the 20,000 shares of stock and paid $750,000 for them. It should not have taken for itself valuable properties, which had produced a profit of hundreds of thousands of dollars, those being properties to which defendant was entitled, and it should not have depleted the income and increased the expenses of defendant by means of contracts which it wrongfully forced some of defendant's subsidiaries to make with companies which were owned by it, and which for the purposes in hand were nothing but Doherty under another name.

Four months later, on October 24, 1921, a special master was appointed. By the terms of the reference, he was required, not only to make the usual inquiry into the assets and liabilities of the defendant, but to take testimony and report his findings of fact and conclusions

of law upon the issues raised by the allegations of the bills of complaint and by the answers of the defendant and the interveners so far as germane. On March 9, 1922, the interveners while endeavoring to prove the allegations of their petition and answer, were met by the objection of the counsel for the complainant, who said they also objected as counsel for the receivers to any proof of correspondence between Doherty, or either member of that firm, and any of the interveners, on the ground that Doherty was not a party to the cause, and had "nothing to do with" it "as far as the·plaintiff is concerned." Counsel further stated that they did not represent Doherty. Apparently on the same ground objection was further made to the interveners offering any proof of their allegations that Doherty had taken for its own benefit property that should have gone to the defendant.

In consequence of these objections the special master felt it best to ask instructions of the court, and on the 16th of March, 1922, he did so. The court acted promptly, and on the next day, March 17, directed the special master to inquire whether the plaintiff was the holder for value of the notes sued upon, and whether it was chargeable with actual or imputed knowledge of the defenses set up by the intervening stockholders to exist between the defendant and Doherty, and whether the plaintiff was so owned or controlled directly or indirectly by Doherty as would make such defenses if they exist valid against it. The special master took testimony on the questions submitted to him. He elicited the facts already recited as to the relations among Doherty, the plaintiff, and the Cities Service Company. His report, dated June 26, 1922, was actually filed in court a week later. He said the evidence left it uncertain whether the two notes sued on and each for $2,000,000 were given in the first instance to Doherty or to the Cities Service Company. They in any event represented the advances made by Doherty, and at the time of the institution of the suit and of the taking of the testimony before him were in the hands of the plaintiff as holder, so that in his view the last named held them for value.

He found that Doherty was a banker only in a sense that it raised capital for the business operations under its management, and that the managing was done by it through many different corporations, which numbered about 230. While Doherty owned a number of properties, the operations directed by it were in large measure carried on through the Cities Service Company, which is in essence a holding company, with many subsidiary companies controlled through stock ownership and otherwise. Among these is the plaintiff, of whose 100,000 shares of stock it owns all but 10. The plaintiff itself appeared to be only a holding corporation, without direct business activities. The officers and directors of the literally hundreds of corporations controlled by Doherty seemed to be taken largely either from the partners of the firm or from its employees; thus one man, who is the assistant secretary of the defendant, testified that he was an officer of probably 200 of Doherty's corporations, and one L. F. Musil, who is treasurer and director of the defendant, thought he was treasurer of a somewhat similar number. The notes in this case were signed by Thomas I. Carter and Louis F. Musil as vice president and treasurer, respectively, of de-

fendant. In the year 1919, when the notes were issued, these gentlemen held the same offices in the plaintiff.

He cited many other undisputed facts which in his and our judgment conclusively demonstrated that in all matters of control and management both the plaintiff and defendant respond to the will of Doherty, either directly or through others in its pay and under its control. In all important essentials of matters of management and operation, and certainly as to all transactions between these differing companies transpiring in the office of Doherty, "there is one supervising, directing, controlling head and one will—that of Henry L. Doherty." He further went on to say that "in these circumstances a transaction such as that under consideration between Doherty" "and one of this group of controlled corporations, or between two of these corporations, must be regarded in its entirety" "as the act of Doherty"; whether that firm made these advancements to the defendant, "received its notes, and then transferred them either directly or through the Cities Service Company to the Cities Fuel & Power Company, or whether the latter company advanced the money and took the notes directly," was "a distinction" which he did "not consider as material." "The transaction in either case was all under one roof, in one office, among persons affected by identity of interest and control, concerning property all within a singly directed organization, and without independence or distinction as to the two sides of the transaction, except in names and doubtless in bookkeeping details." "The will making the determination on one side was also the will that gave the decision on the other." The able special master naturally thought that "weight was added to this view by consideration of the question" "as to what could have caused the" plaintiff "to lend the large sum of $4,000,000 without security" to defendant, "a distinct and wholly unrelated corporation, according to complainant's claim, and apparently a competitor in some of its enterprises." "Aside from the important fact that the plaintiff was a holding company only, and not engaged directly in commercial operations, such a transaction seems not to be explained by considerations of investment or sound dealing in business." "In the light of the actual situation, and the relation of the parties," "it is at least a plausible explanation that this was the mere handling of an item among the many, large and small, which the conduct of this great organization of properties involves."

It inevitably followed that the plaintiff stood "in the shoes of Doherty," and that the "notes in its hands are subject to the same defenses that could be made against them if Doherty" was the complainant. He further held that this conclusion was "not affected" "by the fact that Doherty" owns "much less than the majority of the stock of the Cities Service Company, which itself" "owns practically the entire stock" of the plaintiff. The question, he thought, was "not one of ultimate ownership and potential control, but of control in fact, in the matters here involved." We are fully in accord with his reasoning.

With this report of the special master the interveners may naturally have felt that the technical difficulties in the way of having their controversy with Doherty fought out on its merits were at an end, but

they found themselves mistaken. Three days after the special master's report was filed, ten days after it was dated, the well-known Bankers' Trust Company of New York, hereinafter called the Bankers, filed its petition of intervention. It is, of course, not one of the Doherty group, in the sense that most, if not all, the other bodies corporate with which we are here concerned are; but, as its interests in the cause were not in conflict with theirs, it properly enough employed the same counsel who throughout the litigation represented the original complainant. The filing of this petition for the first time disclosed that as far back as November 1, 1919, the plaintiff had executed and delivered to the Bankers a deed of trust which secured $7,500,000 collateral trust notes and that such notes had been issued. Among the collateral pledged to secure them were the two $2,000,000 notes upon which the bill of complaint was based. By the deed, the plaintiff was empowered to exercise the rights of ownership with respect to the collateral to an extent not inconsistent with the terms of the trust until default in payment of the principal or interest of the notes issued under it. The petition stated that the plaintiff was not in default. It then recited the proceedings in the instant case and the fact of the presentation of the special master's report above referred to.

In view of the circumstances, the Bankers stated that it deemed it to be its duty as trustee to take steps to protect the interest of the holder of the collateral trust notes. It said that the value of the properties of defendant's subsidiary companies was uncertain and speculative, that the oil leases and rights might be entirely lost or might be greatly damaged by being drained by adjoining wells or by salt water, unless prompt steps were taken to develop them, that the subsidiary companies of the defendant were largely dependent upon it for the financial assets and resources necessary for the proper development and exploitation of the properties, that defendant was hopelessly insolvent, and that therefore its assets should be promptly sold. It prayed leave to file its petition, and to adopt the allegations of the original and supplemental bill of complaint, that the defendant might be decreed to be insolvent, that the two notes, aggregating $4,000,000, with accrued interest thereon, might be decreed to be a first lien upon all the assets of the defendant, subject only to legitimate costs and expenses of the suit, and the lien enforced against them by their prompt sale.

The collateral pledged by the deed to the Bankers was a varied assortment of bonds, stocks, and notes of a dozen or more corporations of half as many states and of one province of the Dominion of Canada. The notes issued under it were to mature on November 1, 1922. On the day of the filing of the Bankers' petition, the complainant consented to its being admitted as an intervener and itself filed a petition asking for the sale of the properties and that the interveners be required to assert their claims against the proceeds.

Nothing appears to have been done under an order of July 6 sending the new petition and the old issues back to the master. By what doubtless was the agreement of everybody, the witnesses subsequently examined were heard by the court itself. On September 5, the interveners moved to dismiss the Bankers' petition, setting up against

it, among other things, negligence, laches, and estoppel. In their answer to it, they asserted that the plaintiff had filed its original bill with the knowledge, consent, and approval of the Bankers. From the allegation of the Bankers' petition and testimony subsequently given it appeared that up to September, 1922, something more than $2,600,000 of the notes secured by the deed had been paid off and many of the securities originally pledged had been released. It is possible that the Bankers, before surrendering these, should have demanded some $200,000 more than so far appears was received by it. Moreover, under the provisions of the deed of trust, plaintiff may be entitled to repossess itself of the two $2,000,000 notes of the defendant upon paying to the Bankers 60 per cent. of their face, or $2,400,000 in the aggregate. Neither of the suggestions just made are to be understood as anything more than calls to inquiry and consideration. They are not to be held binding upon us or upon any one else. The deed of trust, after the manner of its kind, is a very labyrinth of words, made but little easier of comprehension by the numbered and alphabeted articles, sections, and paragraphs in which its provisions are grouped. It would be unwise to construe it without the assistance which might be given by arguments of counsel directed to the particular question or questions to be passed upon.

The court on July 6, in contemplation of a sale, had directed the then sole receiver, his colleague having resigned some time before, to have an appraisement made of the properties of the defendant and its subsidiaries. A gentleman approved by all parties was selected to do this work. On September 21, 1922, the court received his report that they were worth $1,520,000. The court was forced to direct the receiver to borrow $5,000, which he had agreed to pay the appraiser; for, as already stated, only $2,500 had in the 19 months of the receivership ever come into the hands of the receivers, and in September, 1921, but $518.80 of that remained unexpended. The plaintiff being willing to lend the $5,000, and nobody else being disposed to do so, the receiver borrowed that sum from it, and gave it his certificates therefor.

On the 27th of September the learned judge below sent a memorandum opinion to counsel in the case, and followed it on the 5th of October by a decree. He correctly held that there had been no breach by Doherty of its agreement "to take care of the current operating expenses of all companies after December 15, 1916," provided these words were given any construction which, in view of all the circumstances, can reasonably be put upon them. He found in substance that the two $2,000,000 notes in suit were executed as the obligations of the defendant by its officers authorized as between it and third parties without notice to the contrary to issue negotiable paper on its behalf, and that the Bankers were holders in due course for value and without notice. We have purposely used phraseology somewhat different from that found in the decree. The conclusion as we have stated it is, we think, not open to question. It does not deny to defendant any right it may have to require the plaintiff, if it remains solvent, to see to it that equity is done.

We are in full accord with the conclusion below that "lot No. 114 Chiampa," and the profit of at least $278,941.10 which Doherty ob-

tained for it, belonged to the defendant; that Doherty had no right to cause the terminal properties, tank cars, and other property needed by some of defendant's subsidiaries and negotiated for by them to be bought by companies owned by it, and that the contracts which it caused some of defendant's subsidiaries to go through the form of making with its companies are not binding. The learned judge below was of opinion that there was no evidence of actual fraud on Doherty's part. Its dominating head may have assumed that it was justified in doing what it did. Men used to handling quickly large and diverse affairs, and accustomed to have their directions implicitly obeyed by hundreds or thousands of others, are prone to persuade themselves that they are entitled to seek what they deem their rights in whatever way seems most likely to prove speedily effective.

In this case we do not feel called on to become searchers of the hearts of men. All that we are bound to do is to ascertain from the record what Doherty did and then to determine what the court should do. Doherty took for itself what belonged to others to whom it held a fiduciary relation, as the court below properly finds. It forced the defendant's subsidiaries, for whom it was in a sense trustee, to make contracts with it, the fairness of which it knew would be challenged by such of the directors of those subsidiaries as were independent of its control, and it withheld from such directors notices of the board meetings at which it put through resolutions making or ratifying such bargains. At various times it threw obstacles in the way of its fellow stockholders examining the books and accounts, which it had kept for the defendant and its subsidiaries. In order that it might take no chance of losing the control of the stockholders' meeting, it insisted on voting the 20,000 shares of stock for which it had not paid, and for which throughout this litigation it claims it never was bound to pay. When the continuance of its domination of the defendant was threatened, it availed itself of the receivership to perpetuate its hold. Throughout the litigation it persistently interposed technical obstacles in the way of an inquiry into its stewardship, and to that end repeatedly claimed that it was not answerable for the actions of corporations which it knew had no will but its own. These facts, none of which we believe are open to question, must speak for themselves. All that we need to say is that they require the granting to the defendant, to its subsidiaries, and to the interveners of as full measure of relief as, consistently with well-established equitable principles, could be given them, no matter by what condemnatory adjectives the conduct of Doherty might be held properly describable.

[3] In its opinion the court held that Doherty's agreement to buy 20,000 shares was no longer binding upon that firm. It said that:

"When I consider the fact that from three to four years elapsed after the organization of the company and before the break between Doherty and Payne et al., during all of which time—notwithstanding McDowell was president and Payne was vice president, and they conducted the business of the company, and Doherty paid no attention to it, as is evidenced by the correspondence between them—no demand was made for the carrying out of this agreement, it seems to me now to come too late, after the insolvency of the company. There was certainly never any actual purchase of the stock by Doherty. It was at most merely an agreement to purchase, which, even if made with the company,

might have been canceled either by mutual consent or by a course of conduct amounting to the same thing. Reluctantly, therefore, I am constrained to the conclusion that I cannot in this proceeding determine the $750,000 proposed purchase price of the stock as an offset to the debts of the plaintiff here set up."

It is not contended by any one that the evidence shows any consideration for defendant's assumed surrender of this valuable right. It is said there is nothing about it in Coleman's proposition to the defendant under which this stock was issued; but that proposal equally ignored other terms of the purchasing agreement, some of which all parties have always treated as fully in force. The truth is that many of the provisions of the fundamental contract had no place in Coleman's proposition and were properly omitted from it. The failure of the defendant and of any of the interveners, some of whom were long among its officers and directors and all of whom were stockholders in it, to call upon Doherty to live up to its bargain in this respect, led the court to believe that it was no longer in force. When the testimony was taken, all the parties were living who would have known of the matter, had any such conclusion been reached. Most of them were examined as witnesses, and not one word tending to suggest anything of the kind was mentioned by anybody.

We hold that Doherty and the plaintiff are still bound by this agreement, and on any accounting between them, or either of them, and the defendant, they must, as of the respective dates at which the defendant paid or was debited with the several installments of interest on that $2,000,000, be charged with a sum sufficient to pay such interest, not exceeding in the aggregate $750,000. It follows of course, that Doherty when these payments have been properly made will be entitled to the 20,000 shares of stock. In the accounts that Doherty or the plaintiff as its assignee presented against the defendant, it was charged with interest at the rate of 8 per cent. compounded semiannually upon all sums advanced by Doherty or upon all sums which Doherty was entitled to receive from it. The court below has properly struck out all charges for compound interest. If, as a result of this method of stating the account, Doherty has really paid or was entitled to receive installments of interest semiannually, and will not get any interest on such installments, it should not be charged with any interest on the sums it should have paid for the purchase of these shares. The account between the defendant on one side and Doherty and the plaintiff on the other should be so stated as to leave each party in precisely the situation it would have been, had Doherty purchased the shares when and as it undertook to do.

[4] The decree of the court directed that the stocks, held by the defendant in its subsidiaries, be sold on October 30, 1922, at a price not less than $1,500,000. Interveners had asked permission to file in advance of any sale a petition setting up certain claims against Doherty growing out of its actual operation of the properties during the receivership. The court said this might be done after, but not before, the sale. We can appreciate its anxiety to get these properties off its hands, but nevertheless, under all the circumstances disclosed by this record, the interveners were and are entitled to have this inquiry made

before, and not after, defendant's assets are brought to the auction block.

One of the Doherty-owned companies, acting under a contract which we have said must be set aside, had during the receivership, without the knowledge of the court, entered into a drilling contract with the well-known Sinclair interests and drilling operations were at the date of the decree for sale going on under it. That any such lease had been made was not disclosed until September 21st, only two weeks before the decree for sale was made. The history of this contract, and of what was being done under it, might have thrown much light upon the value of the properties to be sold; but this information was not available before the sale, because the court thought it unwise to incur the delay which would have resulted if, in advance of the sale, it had permitted an inquiry into what Doherty had done with defendant's subsidiaries during the receivership.

With properties of this kind here involved, a prompt sale was perhaps unusually important; but we are persuaded that the interveners were entirely right in objecting to its being made until the court below had really taken the property out of Doherty's hands, and had found out for itself just what Doherty had done with the property during the receivership. The sale was actually made on the 30th of October, 1922, to the Bankers, as trustee, at the price of $1,600,000. The interveners promptly excepted to its ratification among other grounds, because the sale should have been made free from the Sinclair contracts previously mentioned entered into with one of the Doherty owned companies by an authority claimed by the latter under one of those agreements with a subsidiary of defendant which we have found must be set aside. Upon this ground if there were no others, we hold that the exception to the ratification of the sale should have been sustained.

In the argument, it has been claimed that the drilling operations of the Sinclair interests have shown that the properties of the defendant corporation were of very great value, far in excess of the sum bid for them at the sale, and quite sufficient, not only to discharge any indebtedness which upon the restatement of the accounts may be held to be due from the defendant to its creditors, but ample to leave a substantial sum for its stockholders. It is true that there is little or no substantial evidence that there is any such value in the properties. The chances may be very great that at the new sale the properties will bring no more if as much as was offered for them in that which we are setting aside. It is quite possible that, no matter what deductions may be made from the claims against the defendant, they will still prove large enough to absorb any bid that will be received, and that therefore to set aside the sale will really accomplish nothing, except to add to the expense and delay. However probable all this may be, it is by no means certain, and we are convinced that under all the circumstances of this case the sale cannot be allowed to stand.

The interveners still say, as they always have said, that the plaintiff and Doherty had no right to throw the defendant into receiver's hands, and now that the true facts are known, in part, at least the decree by which receivers were appointed should be set aside. With this con-

tention we cannot agree. Whatever may have been the true state of the accounts between Doherty and the defendant at the time the bill of complaint was filed, and however unfortunate it was that the interveners had no opportunity to be heard before the receivers were appointed, the record conclusively demonstrates that the defendant was not then in a position to manage its own affairs and is not to-day.

One of the receivers having resigned long ago, and the other having been discharged, the court should make another appointment or appointments, and the receivers, through their holding of the stock of the subsidiary companies, should control them. It is to be hoped and reasonably expected that it will not be necessary to make wholesale changes of skilled subordinate agents and employees, but it will be the duty of the receivers to make sure that whoever are in charge recognize the receivers as the officers of the court and as such entitled to their loyalty and obedience.

[5] Various contracts which have been condemned in this opinion should be treated as void. In consequence of them, others have doubtless made expenditures upon or in connection with the properties of defendant or its subsidiaries. The measure of compensation due by defendant for such outlays is the value which they have added to its properties. It would be inequitable to allow it to hold an advantage without payment; but it would be equally unjust to compel it to make good any sums which such others have chosen to spend, but which have not in the end proved of value to it. We have held that it was not responsible for the intermingling of other people's affairs with its own, and the defendant cannot be called upon to bear any part of the loss or of the cost of the disentangling.

It is true that the existence of some at least of these contracts was brought to the attention of the court by the receivers in their report filed as early as March 28, 1921, and it was then stated that the Doherty Companies were willing that they should be canceled if such course was deemed wise. It is said that the interveners failed promptly to take any steps to bring about such cancellation and that therefore, they may not now complain. The fact is that on June 8, 1921, the very day of which they were for the first time allowed to intervene, they enumerated these contracts among what they then and now charged to be the fraudulent practices of Doherty.

The history of this litigation, as we have given it in perhaps wearisome detail, shows that it was not until September, 1922, that the issues raised by the petition of intervention came before the court for consideration, and they were not passed upon by it until, on the 27th of that month, it handed down the opinion which 8 days later crystallized into the decree of October 5. The delay was not due to any failure of diligence for which the interveners can be held answerable, far less to any lack of promptness of the court, for of the latter there was none, either on the part of the judge who handled the case until after the entry of the order allowing the intervention or on that of his successor. It was the result largely, if not altogether, of the fact that, before the interveners could be heard as to what Doherty had done, they were called on to show that complainant was answerable for Do-

herty's doings. It may be suggested that, even while this fundamental question was pending before the special master, the interveners could have found some way by some special motion, petition, or application to call the attention of the learned judge below to the desirability of terminating at once these contracts. That is possible, but the failure of the interveners to do so did not amount to laches.

Throughout the receivership, and probably up to the present time, Doherty has operated and managed the defendant's subsidiaries. It must give an account of the stewardship which it thus took to itself. If it misused the authority, which it in fact exercised for the purpose or with the effect of profiting thereby, it must restore what it has received, and also that of which it has deprived any of these subsidiaries. The properties should be sold in whatever way or ways, at the time the sale is to be made, may seem to the court below most likely to result in the highest possible price. Such sale, however, should not be made until the receivers have come into complete control of the properties of the subsidiaries and have accurate information concerning them, nor before the accounting between Doherty and its companies on the one hand and the defendant and its subsidiaries on the other has progressed to the point at which the amount due from one to the other has been ascertained with such a reasonable approximation to precision as may be required to enable each side to bid intelligently.

It follows that the sale must be set aside, the decrees below reversed, and the case remanded for further proceedings not inconsistent with this opinion.

Reversed.