### TRACY et al. v. WILLYS CORPORATION et al.

### No. 5317.

Circuit Court of Appeals, Sixth Circuit.

Dec. 12, 1930.

Thomas H. Tracy and George D. Welles, both of Toledo, Ohio (Frank M. Cobourn and Tracy, Chapman & Welles, all of Toledo, Ohio, on the brief), for appellants.

Boykin C. Wright, of New York City (Cotton, Franklin, Wright & Gordon, of New York City, on the brief), for appellees.

Before DENISON and HICKENLOOPER, Circuit Judges, and TUTTLE, District Judge.

DENISON, Circuit Judge.

In the latter part of 1921, the Willys Corporation was in receivership. Its chief available asset was a large block of common stock in the Willys-Overland Company. Messrs. Tracy, Chapman, and Welles were counsel for the receiver, and they have received therefor compensation as fixed by the court for all services in the receivership, unless it be an appropriate amount in the subject-matter now involved. This block of stock was eventually sold, so far as the face of the transaction indicated, to Mr. Tracy of this firm, upon the payment by him of some $3,000,000 in cash, and the relinquishment by him to the preferred stockholders of the Willys Corporation of 170,000 shares of Overland stock out of this block, by which entire transaction the creditors were paid in full and the preferred stockholders received property which then had a market value of about one and a quarter millions and, within a relatively short time, came to be valued at three times that amount. In taking this title upon this purchase, Mr. Tracy was without question a trustee. Shortly, if not simultaneously, he acquired two distinct personal interests in the subject-matter of this purchase. From one of these interests he eventually realized a profit of about $225,000; from the other he could immediately have realized a substantial profit which, by holding and later sale at the high point, would have been $200,000. In the court below, which had charge of the receivership, he applied, on behalf of his firm, for compensation from the receivership estate to the suggested extent of $125,000 or $150,000 for his services in negotiating and bringing about this sale. In practical effect, the preferred stockholders are the ones who must pay. The District Court denied the allowance.

The record strongly indicates that great credit is due to Mr. Tracy for bringing about the sale, and that, except for his skill, influence, and financial courage in the negotiations and in the reorganization which was involved, the property might have sold for only enough to pay the debts, and the preferred stockholders might have received nothing. The briefs present a sharp controversy as to whether, in real substance, Mr. Tracy was representing the receivership estate or rather was representing the Toledo group of capitalists which eventually became the purchaser, through the sale to him. Since the creditors were to receive full payment in any event, the interests of the receivership estate and of the preferred stockholders were substantially identical. These preferred stockholders were represented by special counsel, and much of the negotiations seemed to be between this counsel on behalf of the stockholders and Mr. Tracy as spokesman for the Toledo group, dealing at arm's length and in obviously hostile interest; but Mr. Tracy claims this not to be the true aspect of the matter, and insists that he was not representing the Toledo group in making offers, but was acting for the receiver, as one instigating the offers and trying to better them.

We do not find it necessary to decide this controversy. We think the decree below must be affirmed upon another and perhaps simpler ground. It is a familiar principle upon which all parties agree that, where property is to be sold by a receiver, neither he nor his counsel can be substantially interested as a purchaser, and that, if such interest exists, neither he nor his counsel can have from the estate any compensation for services in bringing about the sale, no matter how valuable to the estate this service may have been.[1] While this rule works injustice in some cases, it is so firmly fixed, and so imperatively required by the principles of equity, that it must be applied and enforced without deviation. Its application obviously cannot depend upon the form which the transaction of sale takes, but a court of equity must look

---

[1] Michoud v. Girod, 4 How. 503, 555, 11 L. Ed. 1076; Magruder v. Drury, 235 U. S. 106, 119, 35 S. Ct. 77, 59 L. Ed. 151; Jackson v. Smith, 254 U. S. 586, 41 S. Ct. 200, 65 L. Ed. 418.

through all forms to the substance of the things done.

The bid was made by Mr. Tracy, and its good faith guaranteed by his personal check of $150,000 (though in fact he held a guaranty from the purchasing group which protected him against loss on this check). This proposed sale to him was confirmed by the court on July 31. In the next two or three days he procured the necessary funds from the Toledo group, and on August 3d paid the money to the receiver and received the stock. Upon the same day, he entered into a double arrangement with the Toledo group by which he took over a part of the stock at the group's cost price, and by which, on only a nominal payment, he became a joint adventurer with them in another portion of their purchase contract. It was from these two items that he gained the profit above stated. Undoubtedly, up to the time the money was paid over and the stock received, Mr. Tracy was, in form and in obligation, a trustee for those really in interest, and the use of his name as purchaser could well be laid out of sight, as having been merely a convenient form. It is definitely stated by him and by the Toledo group that there had been no agreement among them that he would or might become interested with them or take any part of the adventure off their hands. We must accept this as the undisputed fact, exactly as it is stated, and concede that, if he had then wished to take an interest and they had refused him, he would have no legal right to complain. At the same time, and without recounting the circumstances which support the conclusion, we cannot doubt that there had been, on the part of the Toledo group, a willingness that Mr. Tracy should join them and an expectation that he would, and, on the part of Mr. Tracy, the general intention to join, if they would permit him, and an expectation that they would easily come to some definite agreement as to how much he would take and upon what terms. This conclusion must essentially rest upon the great difficulty, not to say impossibility, of accounting for the things which were done, unless there had been in the background this constant expectation, and such an amount of mutual confidence, or other mutual relation, that expectation, without contract, was enough.[2]

To consider this situation, as justifying the refusal of all compensation from the receivership estate, is perhaps without exact precedent, but it seems to us required by the extreme strictness which must attend the proper maintenance of the relationship between the receiver and his estate.

The decree is affirmed.

---

[2] Not the least impressive of these circumstances is the fact that, when the acceptance of the bid came up for the final order of approval, Mr. Tracy thought proper to have the record show his withdrawal as counsel for the receiver and the presence of other counsel specially appointed to advise the receiver as to making this sale. The appointment for this purpose of a lawyer who was not otherwise heard of in the case, before or after, and the fixing of $1,000 as the value of his services, indicate that this was a mere gesture. The explanation offered is that, by naming Mr. Tracy as the purchaser, the record was substantially untrue, and therefore should be made to show a neutralizing fact, also substantially untrue, that he was not the counsel for the receiver. It is not completely satisfactory.