**PHELAN v. MIDDLE STATES OIL CORPORATION et al.**

**COHEN et al. v. TUMULTY et al.**

**No. 214.**

Circuit Court of Appeals, Second Circuit.
March 21, 1946.

As Revised on Denial of Rehearing
April 16, 1946.

SWAN, Circuit Judge, dissenting.

Kraushaar & Kraushaar, of New York City (Meyer Kraushaar and David I. Kraushaar, both of New York City, of counsel), for appellants.

Joseph P. Tumulty, of Washington, D. C., and Joseph Glass, of New York City, pro se (Leslie Kirsch, of New York City, of counsel).

Sheppard & Seipp, of New York City (John S. Sheppard, of New York City, of counsel), for Middle States Petroleum Corporation.

Before SWAN, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. Because of the brevity of the district judge's opinion and because he made no findings, we have been obliged, arduously, to gather the pertinent facts from the parties' affidavits and those portions of the voluminous receivership records presented to us by the parties on this appeal. What we say of the facts should therefore be read with the understanding that they may appear to be very different after a further hearing in the court below. Necessarily, whatever comments we make on the basis of this incomplete record must be read as

if they were written in the subjunctive mode. We are entering no final decision.

Since only in the United receivership was there an order discharging the receivers and approving their final accounts, our concern on this appeal is primarily with that receivership, the order denying access to the receivers' unfiled papers being interlocutory in so far as it affects the other receiverships. But we cannot, in our general survey of the facts, disregard what there went on. For appellee Glass, in an affidavit filed in the district court in opposition to appellants' motions, stated that the numerous companies "were, prior to receivership, operated as a single business," and "honey-combed with advances and inter-company accounts." He added that "the practice of making advances from the subsidiaries to their parent corporations which antedated the receivership was continued by the receivers"; that the receivers "administered [the companies] as a unity"; and that the plan "was consummated and the new parent company began to function on January 1, 1930, before the inextricably intertwined affairs of the subsidiaries and the old parent companies were straightened out by the receivers." [2a]

2. Having in mind such cases as Crites, Inc., v. Prudential Co., 322 U.S. 408, 64 S.Ct. 1075, 1079, 88 L.Ed. 1356, and others cited below, we think the general principles applicable here are as follows: A receiver, as "an officer or arm of the court," is a trustee with the highest kind of fiduciary obligations. He owes a duty of strict impartiality, of "undivided loyalty," to all persons interested in the receivership estate, and must not "dilute" that loyalty. He is "bound to act fairly and openly with respect to every aspect of the proceedings before the court. * * *

The court, as well as all the interested parties," have "the right to expect that all its officers," including the receiver, will not "fail to reveal any pertinent information or use their official position for their own profit or to further the interests of themselves or any associates." [3] A receiver has the "affirmative duty to endeavor to realize the largest possible amount" for assets of the estate. [4] If he has vital information which, if disclosed, might bring a better price for property which is sold pursuant to court order, he must fully disclose it "prior to the sale when the prospects [are] greater for successful bargaining." [5] Since failure to make such full disclosure has "a tendency to dampen the sale," [6] it is presumed that it did so, where the receiver had an interest in the sale in conflict with that of any other parties to the proceeding, "regardless of whether it actually had an adverse effect or not," because "the incidence of a particular conflict of interest can seldom be measured with any degree of certainty." [7] A decree confirming such a sale does not exculpate the receiver. [8] When the receiver has brought about such a sale, and the property after the sale has been transferred to a company in which interests of innocent third persons have become vested, usually the sale will not be set aside if there is available the more practicable method of surcharging the receiver for the difference between the price paid and the value of the property. [9] Where a receiver has a possible personal interest adverse to those of any parties to the receivership, it is usually unwise for him to participate in the reorganization; if he does so he must act with unusual caution; that the court has acquiesced in his participating does not relieve him of his duty of disinterestedness. [10] A receiver who has strayed from his duty

---

[2a] He added that this practice of "advancing the cash of subsidiaries necessary to carry on the business of the entire System" continued after the reorganization.

[3] Crites, Inc., v. Prudential Co., supra; Woods v. City Nat. Bank & Trust Co., 312 U.S. 262, 263, 61 S.Ct. 493, 85 L.Ed. 820.

[4] Jackson v. Smith, 254 U.S. 586, 588, 41 S.Ct. 200, 201, 65 L.Ed. 418.

[5] Crites, Inc., v. Prudential Co., supra.

[6] Id.; cf. Button v. Cities Fuel & Power Co., 4 Cir., 300 F. 280, 299, 301, certiorari denied 266 U.S. 619, 45 S.Ct. 99, 69 L.Ed. 471; Investment Registry v. Chicago & M. E. R. Co., 7 Cir., 212 F. 594.

[7] Crites, Inc., v. Prudential Co., supra;

Woods v. City Nat. Bank & Trust Co., supra; Jackson v. Smith, supra; cf. as to trustees generally, President and Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465, 476; Restatement of Trusts, § 170, comment c.

[8] Crites, Inc., v. Prudential Co., supra; cf. Pangburn v. American Vault, Safe & Lock Co., 205 Pa. 93, 54 A. 508, 510; Gutterson & Gould v. Lebanon Iron & Steel Co., C.C., 151 F. 72, 76, 77.

[9] Pangburn v. American Vault, Safe & Lock Co., supra; cf. Koontz v. Northern Bank, 16 Wall. 196, 202, 203, 21 L. Ed. 465.

[10] Martin v. Luster, 7 Cir., 85 F.2d 833.

to the injury of anyone interested in the estate can and should be surcharged when he asks approval of his final accounting.[11] The rule that a receiver must not be motivated by personal considerations is prophylactic; its sanction is a surcharge.[12] A person interested in the estate who asks such surcharging is not barred because of laches if he acts with reasonable promptness after he discovers the facts showing such misconduct by the receiver.[13]

3. Just before these receiverships came into being, Glass had been the lawyer for stockholders of Middle States in a stockholders' suit against that company (a suit apparently still pending in the court below).[14] He thus represented interests potentially in conflict with those of the United bondholders. For Middle States owned all the stock of Imperial, and directly and indirectly, all the stock of United; Eureka was wholly-owned by United; and Imperial had guaranteed the bonds of United. The Supreme Court has said that "the equity owner is peculiarly ill-suited to represent the mortgagee in those situations because of their historic clash of interests." [15] As the receiver of Middle States, of Imperial, of United and of Eureka, Glass should have been exceptionally vigilant to protect the interests of United bondholders whenever they conflicted with those of Middle States.[16]

We know, from the receivers' reports, and from Glass' letter of July 12, 1929, that Glass, while receiver of these several companies, took an active part, in cooperation with the reorganization committee (the formation of which the receivers had brought about), in the formulation of the reorganization plan. The reorganization committee determined the prices to be bid at the judicial sale for the United assets by the committee, the only bidder at that sale. These prices fixed the pro-rata amount of cash required to be paid, as part of the plan and the decree, to those United bondholders who did not accept the new securities offered under the plan. There is need to enquire further in order to ascertain whether Glass—who worked closely with the committee [17] and was selected by it as the chief executive of the new company—had, in advance of the sale, agreed with the committee on those prices.[18] If he had, then he agreed that the non-depositing bondholders would be paid but sixty-eight cents on the dollar.

The propriety of such a figure depended on such data, inter alia, as (a) the value of the Eureka stock, which in turn depended in part on the value of Eureka's physical assets, and (b) the worth of Imperial's guaranty of the United bonds, and (c) the worth of United's claims against Middle States, which in turn depended on the worth of the securities and claims owned by Middle States, which in turn depended on the value of the physical assets owned by the divers subsidiary companies. In other words, to determine whether sixty-eight cents on the dollar was a fair amount to be paid to non-assenting United bondholders required a knowledge both of the values of the underlying physical properties of the underlying subsidiaries

---

[11] Crites, Inc., v. Prudential Co., supra.

[12] Woods v. City Nat. Bank & Trust Co., supra; Weil v. Neary, 278 U.S. 160, 173, 49 S.Ct. 144, 73 L.Ed. 243; Crites, Inc., v. Prudential Co., supra; Jackson v. Smith, supra; Magruder v. Drury, 235 U.S. 106, 119, 120, 35 S.Ct. 77, 59 L.Ed. 151.

[13] Crites, Inc., v. Prudential Co., supra, 322 U.S. at page 417, 64 S.Ct. at page 1081, 88 L.Ed. 1356, note 8.

The surcharging is not limited to an amount measured by the interest of the particular person thus objecting to the receiver's accounting, since the surcharge is for the benefit of all similarly situated persons. For the court, in administering the estate in its custody for all the beneficiaries, must see to it that none of them suffers because of the misconduct of its receiver, and the discharge of that obligation should not depend upon their appearance in court to voice their objections to that misconduct. Cf. Moon v. Wineman, 57 Minn. 415, 59 N.W. 494, 495. Thus, if the judge learned of the misconduct from a wholly neutral source (cf. Investment Registry v. Chicago & N. E. Ry. Co., supra, 212 F. at page 608), he should surcharge the receiver and distribute among all interested the money owing to the estate by the receiver because of that misconduct.

[14] As late as June 1943, Glass' law partner asked the court not to dismiss that suit begun by Glass as counsel in 1924.

[15] Woods v. City Nat. Bank & Trust Co., supra [312 U.S. 262, 61 S.Ct. 495].

[16] Cf. Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121, 123.

[17] One of the members of the reorganization committee was the chairman of the stockholders' committee which Glass, in 1924, had helped to organize.

[18] Cf. Tracy v. Willys Corp., 6 Cir., 45 F.2d 485, 487.

and of the inter-system accounting, and Glass, of course, so understood. In their reports filed before the sale in the consolidated receivership proceedings, the receivers had stated that they felt a moral obligation, stemming from "their position of disinterestedness," to ensure a reorganization fair to all interests. These reports had emphasized the fact that valuations of the properties were essential to such a reorganization. They had said the same of accurate inter-corporate accounting (including balance sheets)—and well they might, in view of the fact that the affairs of the companies (to quote Glass) were "honey-combed with advances and inter-company accounts." [19] In these reports the receivers had also stated that they were obtaining valuation reports from valuation engineers, and accounting reports from expert accountants. In their Third Report dated May 27, 1928—the last report made before the sales—the receivers said that the valuations "are expected to be completed in about 30 days," and that correct balance-sheets were nearing completion. They added that they felt it their duty "to leave these companies, when they emerge from receivership, with their assets and liabilities known and listed and with their affairs in order."

But the receivers never filed in court the corrected balance sheets, or those valuation and accountants reports. Nor did the reports of the receivers themselves contain or reflect such information.[20] From them no one could tell the net worth of Turman or the worth of the Eureka stock or the value of United creditor claims against Middle States and other companies. Similar information was omitted from the reorganization plan; attached to it are a list of intercorporate stock ownerships, a statement of oil production, a "summary of net income from operations and application of cash receipts and disbursements," and a list of bank balances— but no balance sheets or valuations. As above noted, Glass conceded that "the plan was consummated and the new parent company began to function on January 1, 1930 before the inextricably intertwined affairs of the subsidiaries and the old parent companies were straightened out by the receivers." This plan, consummated under such conditions, contained a letter from the receivers stating that it "does substantial justice to all the interests involved" and urging is acceptance.

In the circumstances, we think that Glass assumed a peculiarly grave responsibility for the fairness of the treatment of non-depositing United bondholders. As a receiver—and especially as receiver of companies with potentially clashing interests—his obligations to the United bondholders were extensive. He stated that he felt it his duty to bring about a reorganization just to all interests; on the facts as they appear on this record he seems to have withheld from the court records information from which each United bondholder might have formed his own independent judgment of value; and he aided in the formulation of a plan which omitted such information but which he recommended as fair to those bondholders. Accordingly, while on a full hearing it may seem otherwise, on the present record much is to be said for the proposition that Glass virtually underwrote the fairness of the amount paid to non-assenting United bondholders. He had, as receiver, "obtained inside information" [21] concerning the affairs of the several companies, the values of their assets, and the status of the intertwined accounts, and (so it seems on the record now before us) had communicated that information to the reorganization committee and to other committees but not to United bondholders individually. Under such conditions, no one other than the reorganization committee could intelligently bid at the sales.[22] True, the receivers' interim reports and the plan stated that Turman had become highly successful and that, accordingly, the Eureka stock, pledged to secure the United bonds, had increased very substantially in value. But, without valuations and balance sheets, such statements were too vague to be adequately informative to the United bondholders or to a bidder desiring to compete with the committee for the purchase of that stock. The same is true of the sales of the other as-

[19] See Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982.

[20] Thus their Third Report contained only the following figures: (1) daily net oil production, (2) summaries of net income from operations and applications of cash receipts and disbursements, (3) claims filed and debts paid or disposed of during the receivership, (4) bank balances, (5) statement of acreage and production, (6) federal taxes, and (7) interrelated stock ownerships.

[21] Cf. Martin v. Luster, supra.

[22] Cf. Button v. Cities Fuel & Power Co., 4 Cir., 360 F. 280, 299, 301.

sets; and the fairness of the prices those other assets brought may be pertinent if it appears that, had those assets fetched higher prices, something would have been realized for holders of United bonds on Imperial's guaranty or through debts of Middle States or still other of the companies to United.

Appellees make much of the fact that on December 9, 1929 (some four months after the plan was published and but a week before the sales), the receivers filed in court a proposed detailed statement of adjusted intercorporate claims, and that on December 14, 1929, the court, on the receivers' petition, and on notice solely to the committees and to "the parties to the cause" (i.e., to the persons who had entered appearances) entered an order approving this statement.[22a] But this statement could not enlighten prospective bidders [22b] or non-depositing United bondholders (even if they had known of it) as to the worth of these claims, in the absence of balance-sheets and especially of valuation data; for the worth of a claim against a company obviously depends on the value of its assets. Moreover, the court order of December 14 approving these readjusted claims expressly left them "subject to readjustment" by further orders of the court upon further application by the receivers— an exceedingly elastic provision, which kept the status of the accounts uncertain, and of which the receivers availed themselves several months after the confirmation of the sales and the transfer of the assets to the new company. Here again we note, as markedly pertinent, Glass' recent affidavit to the effect that, "the plan was consummated and the new parent company began to function on January 1, 1930, before the inextricably intertwined affairs of the subsidiaries and the old parent companies were straightened out by the receivers."

Appellees also make much of the following facts, said by them to demonstrate full disclosure to prospective bidders and to bondholders: (a) Article Sixth of the court's decree of sale relating to the "free" assets required the receivers to file with the court clerk on or before December 6, 1929 (ten days before the sale) "a statement showing and describing as definitely as practicable and made up to the latest day reasonably practicable, but in general terms" all of the assets to be sold, adding that this statement was to be "advisory only," and was not to be binding upon, nor should any accuracies therein release, a purchaser or bidder. This decree also prescribed the form of the notice of sale, including a paragraph reading, "For further particulars, including a more particular description of the assets to be sold * * * intending purchasers are hereby referred to said decree * * * and to the statement to be filed with the clerk of the court as in said decree directed." (b) The prescribed notice of sale was published. (c) On December 6, 1929, the receivers filed with the clerk a "Statement" purporting to respond to Article Sixth of the decree. It consisted of seventeen typewritten pages. It contained facts as to Middle States, Imperial, Oil Development, and United; the facts as to Middle States covered seven short typewritten pages; and those as to the other three companies, three such pages each. We quoted in full above, as typical, the portion dealing with United. It will be seen that it concludes with a sentence reading, "Further information with respect to the foregoing may be obtained upon request, at the offices of the receivers." [22c] Appellees maintain that this "Statement" was a full disclosure.

We cannot agree. The few pages dealing with United (which we take as typical) showed merely the following: The amount of cash in coupon and sinking fund accounts; the ownership of the Eureka stock; miscellaneous accounts receivable in undetermined amounts; three intercompany claims owing to United; [22d] the outstanding United bonds; indebtedness of the receivers, in unascertained amounts; and claims by other companies in the system "for post-receivership advances * * *—amounts undetermined." It contained no balance sheets and no valuation data; without such information, it was uninformative. The sentence with respect to

---

[22a] No published notice was given of the petition or of the court's order approving the statement.

[22b] The order approving it was made two days before the sales.

[22c] The statements as to each of the other three companies contained a similar concluding sentence.

[22d] This skeletonized statement as to intercorporate claims was even less adequate than the statement, discussed above, approved by the court on December 14, two days before the sales.

"further information" did not meet the deficiency. For see: A person reading the published notice of sale would find (as above noted) that it stated, "For further particulars, including a more particular description of the assets to be sold, and of the terms of sale, intending purchasers are hereby referred to said decree * * * and to the statement of said receivers to be filed with the clerk of said court as in said decree directed." If he had then read the decree, it would have told him virtually nothing he would want to know. If he went to the clerk's office and there read the "Statement" filed December 6, he would naturally suppose that it contained the vitally important facts intended to guide a prospective bidder. He would not normally believe that such important facts could be learned only by a request to the receivers (made within ten days before the sale) but would assume that any additional information thus obtainable by "request" would be relatively unimportant, marginal; for he would think that the receivers, presumably aiming to stimulate competition in the bidding, would reveal, in the Statement itself, what they considered the essential information helpful to potential bidders, since the decree had directed the filing of the "Statement" in order to advise such bidders. Why the receivers did not include the balance sheets and valuation reports (or summaries thereof) in their filed "statement of assets" is unexplained. On the record now before us, it would appear that they did virtually nothing to assist potential purchasers.[22e] However, on a further hearing, it may perhaps be shown that such was not the case.

Although the decree shows that the "Statement" was designed primarily for "intending purchasers," appellees urge that it should be regarded as also advising nondepositing United bondholders.[22f] We assume, arguendo, that it should. But how unenlightening the "statement of assets" would have been to any such bondholder, otherwise uninformed, we know from the fact that the receivers in their reports had previously said that correct valuations, when received by them, would be "used as the basis for proper book entries," making possible "for the first time * * * an orderly accounting record," and that "valuations and balance sheets are essential before any reorganization can be worked out."[22g]

To be sure, as appellees suggest, personal communication with non-depositing holders of United bearer bonds was not feasible. But, had the receivers desired to do everything practicable to inform such persons of the valuation data, they would have pursued the time-honored conventional course, i.e., they would have filed the balance sheets and valuation reports with the court clerk and then published a notice that they had done so. The receivers, in their brief and petition for rehearing, have as yet not adequately explained why they did not take these obvious steps but, instead, adopted a course which would make it least likely that any non-depositor would learn of the valuation data and balance sheets. Perhaps such an explanation will be forthcoming in the further hearings in the district court.

Strikingly in contrast with the receivers' failure thus to inform non-depositing bondholders, is this fact, repeatedly asserted in appellees' brief: The receivers—without any special "request"—had furnished this very data (valuations and balance sheets) to the committees which formulated and endorsed the plan. As the plan was published July 29, 1929, this information had thus been given to the committee representing depositing United bondholders, more than four months before the receivers'

---

[22e] Prospective purchasers of the Eureka stock—admittedly the most valuable asset of United—did not receive even the vague hint that "further information" might be obtained "on request" from the receivers; for the decree ordering the sale of that stock did not require the filing of any "statement of assets," nor did the published notice of that sale refer in any way even to the unsatisfactory "Statement" filed December 6.

[22f] Appellees note that Cohen and his wife owned Oil Development stock; that the sales decree required the notice of sale to be mailed to stockholders of that company; and that that notice contained the sentence referring to the "statement of assets." Wherefore, say appellees, Cohen and his wife had notice by mail of the filing of that statement. Because of the insufficiency (discussed above) of that notice as adequate disclosure, we need not here consider whether, had it been sufficient, it would have served as notice to Cohen as a holder of nondeposited bonds.

[22g] What we said above as to the inadequacy of the "further information" sentence with respect to prospective purchasers applies as well to nondepositing bondholders.

"Statement" of December 6 was filed. Indeed, appellees seem to contend that this was the appropriate way of informing the non-depositors: They say that, because of these advices to the United bondholders' committee, "it is immaterial" that these data "were not placed in the court files"; and they assert, repeatedly, that, as this committee, thus informed, approved the plan and the sales prices, it must be assumed that the non-depositors received their due. In other words, appellees' position, in effect, seems to be that the receiver discharged their fiduciary duty, owing to all United bondholders, when they made full disclosure to the committee representing those who deposited. Of course, that is not true. The receivers represented all non-depositing as well as depositing claimants, but the committee did not. Fully to inform non-depositors was as much the duty of the receivers as to inform the committee. The very fact that no committee represented non-depositing United bondholders imposed on the receivers an obligation to keep them fully informed, to make essential information as easily accessible to them as was practicable.

 Appellees, however, contend that all information obtained by the committee representing deposited United bonds must be imputed to Cohen. We here assume (without indicating possible qualification) that Cohen, in his capacity as a holder of deposited United bonds, and with respect to such bonds, must be treated as having had such knowledge "constructively." But, absent any proof that actually (not merely "constructively") Cohen had such knowledge, we do not agree that it is to be imputed to him in his capacity as a holder of the non-deposited bonds, or to the person or persons who previously held those bonds.

 That the United bond committee considered the plan fair to those whom it represented—persons who would accept the plan and receive new securities—did not at all mean that the treatment of non-depositors was fair.[22h] It was not enough that the plan be fair to those who accepted; it was also necessary that the sales price (in which alone the non-acceptors would

participate) should be fair. Equally necessary was it that the receivers make every feasible effort to see to it that individual bondholders who had not yet accepted be fully advised of all important facts, so that they could informedly decide whether or not to accept the new securities rather than their pro rata shares of the sales prices. On the record as we now have it, it would seem that the receivers came far from making such an effort.

With this background, we consider the charges made by appellants (charges, be it understood, that we do not accept as true on this incomplete record). They charge that Glass brought about the foreclosure of the United bonds and the sale of the Eureka stock, pledged as collateral therefor, in this way: That foreclosure could not have occurred except for the failure to pay overdue interest on the United bonds, with the resultant acceleration of their maturity and foreclosure by the trustee. But, say appellants, had Glass as receiver of United been safeguarding with undivided loyalty the interests of the United receivership estate, funds could have been obtained to pay that interest.[23] The values were such, say appellants, that had that default and the foreclosure been thus prevented, the bonds would ultimately have been paid in full. But, they charge, Glass did not pursue that course; instead, he allowed his other conflicting interests to dominate his judgment; and he wanted, for his personal financial advantage, to become president of the new company arising from a plan which (in order to meet the desires of security holders of Middle States and companies other than United) was contrived to the serious detriment of the non-assenting bondholders of United. To that end, it is charged, colluding with the reorganization committee, he deliberately failed to take steps to pay the interest on the United bonds. He also agreed, say appellants, with the committee, to a price at which the Eureka stock was to be, and was sold at the judicial sale, a price far less than its fair value, Glass' failure to put of record the valuation and full accounting data before the sales must be presumed, appellants maintain, to have chilled the bidding, for only the reorganization

---

22h Again and again, appellees refer to the fact that the United bond committee represented holders of 94% of such bonds. But it is irrelevant that a large percentage of assenters approve of treatment unfair to non-assenters comprising a small minority. Cf. Case v. Los Angeles Lumber Co., 308 U.S. 106, 115, 60 S.Ct. 1, 84 L.Ed. 110.

23 Whether that is true requires a knowledge of the kind previously outlined, i.e., a knowledge of the inter-corporate accounting and of the values of the physical properties in the system.

committee, which bought at the sales, knew what the assets were worth. Because of the agreement that he was to be the new company's president, Glass, argue appellants, "was under a double duty to make complete disclosure of the true value of the assets to be sold; he was thus in the position of being a purchaser at his own sale." [24]

Moreover, say appellants, the United bondholders—both those who took new securities offered in the plan and those who instead took their pro-rata share of the cash bid at the sales—were justified in relying on Glass in the belief that they were receiving all to which they were entitled, because they justifiably relied on his assurance that the plan was fair to them; and that assurance, as to those who did not deposit under the plan but took their share of the purchase price, amounted to an assurance that foreclosure was unavoidable and that the prices to be bid by the reorganization committee at the sales would be the best reasonably obtainable.

 Postponing, for the moment, consideration of appellees' contentions as to estoppel and laches, we think that appellants' charges on the facts now before us, have sufficient merit to require a full hearing in the district court. "That a trustee owes his beneficiaries undivided loyalty entirely untinged by considerations of any important benefits to himself is an old truth, and one whose edge cannot be dulled by frequent use. If the trustee here allowed its judgment to be affected by any such factors, it acted improperly. Cf. Pepper v. Litton, 308 U.S. 295, 311, 60 S.Ct. 238, 84 L.Ed. 281." [25] Because of his conflicting positions, the burden rests on Glass to show that the defaulted interest could not have been paid and that the prices at the sales were fair. [26]

 The crucial question thus becomes this: Have appellants made out a prima facie case, not rebutted by appellees, that the values were as they assert? On that issue, appellants rely on the balance-sheets of United and Imperial as of December 31, 1929 (about the time of the reorganization) contained in income tax returns filed with the federal income tax officials by the receivers. Accepting the figures in these balance-sheets, United could have paid its bonds in full, and, if it could not, Imperial, guarantor of those bonds, could have met any deficiency. Appellees do not deny that the balance-sheets contain the figures as alleged by appellants. Nor have they offered any value data to contradict those figures. They contend, however, that, being but cost figures, they are not reliable evidence of value. But absent any other evidence, they do show a prima facie case, [27] certainly one

---

[24] Cf. Restatement of Trusts, § 170, comment c; Tracy v. Willys Corporation, 6 Cir., 45 F.2d 485, 487.

[25] York v. Guaranty Trust Co., 2 Cir., 143 F.2d 503, 514, 515, reversed on other grounds, 326 U.S. 99, 65 S.Ct. 1464.

Chief Justice Stone has said that this principle embodies "the precept as old as Holy Writ, that 'a man cannot serve two masters' * * * No thinking man can believe that an economy built upon a business foundation can long endure without loyalty to that principle." Stone, The Public Influence of the Bar, 48 Harv.L. Rev. 1, 8. In Bayer v. Beran, Sup., 49 N.Y.S.2d 2, 5-7, Mr. Justice Shientag said: "The fiduciary has two paramount obligations: responsibility and loyalty. * * * They lie at the very foundation of our whole system of free private enterprise and are as fresh and significant today as when they were formulated decades ago. * * * While there is a high moral purpose implicit in this transcendent fiduciary principle of undivided loyalty, it has back of it a profound understanding of human nature and of its frailties. It actually accomplishes a practical, beneficent purpose. It tends to prevent a cloud-ed conception of fidelity that blurs the vision. It preserves the free exercise of judgment uncontaminated by the dross of divided allegiance or self-interest. It prevents the operation of an influence that may be indirect but that is all the more potent for that reason."

[26] Cf. Irving Trust Co. v. Deutsch, supra, 73 F.2d at page 124. As to his burden with reference to the amount of damages, see Bigelow v. RKO Pictures, Inc., 66 S.Ct. 574; Package Closure Corporation v. Sealright Co., 2 Cir., 141 F.2d 972, 979, and cases cited, supra, note 7.

[27] Heller v. Speier, 119 Neb. 787, 230 N.W. 835; Rewick v. Dierks Lumber & Coal Co., 109 Neb. 300, 190 N.W. 875; Miller v. Dilkes, 251 Pa. 44, 95 A. 935, Ann.Cas.1917D, 555; Wesp v. Muckle, 136 App.Div. 241, 120 N.Y.S. 976. See also, Hinkel v. Motter, D.C., 39 F.2d 159, 161; Oberwinder v. Commissioner, 8 Cir., 147 F.2d 255, 259; Cameron v. Commissioner, 3 Cir., 56 F.2d 1021; Hurley v. United States, D.C., 10 F.Supp. 365, 368.

That the figures in the income tax report are on a consolidated basis is not sufficient, absent countervailing evidence, to destroy their evidentiary worth.

sufficient to necessitate further judicial inquiry. Appellees have supplied no evidence to contradict this showing. It is relevant, in this connection, that the engineers' valuation reports and the accountants' reports have not been produced to rebut appellants' contentions; and it is not to be ignored that Glass, when asked by appellants to produce them, stated in an affidavit that there would be "danger" in making that information accessible to appellants—a curious position for a receiver to take, on his final accounting, concerning reports for which he paid out of the receivership assets, a position which cannot but raise a suspicion that such information would tend to substantiate, at least to a considerable extent, the balance-sheet figures in the income tax return.[27a]

■ 4. Since appellants seek no relief with respect to the United bonds which Cohen exchanged for new securities under the plan, we need not consider whether that exchange would have barred appellants had they sought, with respect to those bonds, to surcharge the receivers. But we cannot agree that that exchange of those bonds prevents appellants, as successors of Cohen with respect to the unexchanged bonds, from thus seeking to surcharge.[28] As to those bonds, Cohen was in no different position from any other holder of undeposited bonds. There is nothing to show that he had better information than any other such holder; and no such holder, unless (unlike Cohen) he received special advice from the receivers or the committees, was informed of the data in the hands of the receivers as to values or (a related fact) as to the ability of the receivers to pay the interest on the United bonds.[29] Accordingly, as matters appear on the present record, appellants are not estopped, and are

not guilty of laches.[30] They seem to have acted promptly when they recently obtained the income tax reports. Mere lapse of time, no matter how long, does not constitute laches; Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099; Northern Pacific Railway v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; Holmberg v. Armbrecht, 66 S.Ct. 582.[31]

■ Appellants do not ask (nor do they need to ask) that the decrees ordering or confirming the sale be set aside. They are not attacking the reorganization as such. They are seeking to hold Glass, as receiver, liable on the alleged ground that he misbehaved to the injury of his cestuis. It will not do to say that Glass merely obeyed what the court decreed, if on a full hearing it turns out that improperly he helped to bring about those decrees.[32]

■ The judge's guarded statement concerning the plan fell far short of its judicial approval. Nothing in the record substantiates appellees' assertion that he knew all about it; nothing indicates that, if it is true as appellants charge that the default in payment of the bond interest could have been averted or that the values were such that the prices at the sales were far below fair prices which would have been realized if full information had been supplied, the judge was aware of those facts. It is apparent that the judge—having had marked confidence in Glass' ability to preserve disinterestedness, despite the conflicting interests of the many estates of which Glass was receiver, and despite the fact that Glass came into the matter as a representative of Middle States stockholders—relied upon Glass' advice as to the inability to pay the interest and as to the adequacy of the prices.[33] If the facts as to

[27a] In the hearings to be held in the court below, in ascertaining values, attention should be paid to the earnings of the several companies. See Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 526, 527, 61 S.Ct. 675, 85 L.Ed. 982.

[28] Cf. Central Improvement Co. v. Cambria Steel Co., 8 Cir., 210 F. 696, 710 et seq., affirmed sub nom. Kansas City Ry. v. Guardian Trust Co., 240 U.S. 166, 46 S.Ct. 334, 60 L.Ed. 579.

[29] The record does not support the statement of the district judge that Cohen "had full knowledge of what was done with respect to the assets" of United and "also had complete appreciation of the significance there," if the judge meant that

Cohen was informed of the values and accounting.

[30] Indeed, when appellants first charged Glass with misconduct, the judge said in an opinion that he would not hear them until the receivers had filed their final accounts.

[31] See Central Improvement Co. v. Cambria Steel Co., supra, 210 F. at page 713, where the Court said: "Laches is equitable estoppel under another name * *." See also Ferguson v. Wachs, infra.

[32] See cases cited in notes 3 to 16, supra.

[33] We may add that detailed information privately given to the judge would not necessarily estop those interested, to whom

values and as to Glass' alleged duplicitous conduct (which, if it occurred, was of course unknown to the judge) are substantially in accord with appellants' contentions, Glass cannot hide behind the judge's decrees or his approval of Glass' becoming president of the new company.[34]

Although appellees do not suggest it, the following argument might conceivably be advanced: The reorganization, in respect to United bondholders, violated the Boyd case principle[35] and this fact was apparent on the face of the plan; as neither Cohen's predecessor in title nor Cohen seasonably objected, the relief sought by Cohen's executors against Glass is barred even if he wrongfully assisted in consummating the plan. There are several answers to that suggestion. We mention but one: The Boyd case principle was violated if stockholders or creditors of Middle States, without adequate new consideration, received under the plan a participation in United assets and if United bondholders were not offered in the plan the equivalent of payment in full, since even the creditors of Middle States were not creditors of United but creditors of a stockholder of United. But, considering the lack of information in the court files and in the plan, no United bondholder not in the confidence of the receivers or of the committees could have discovered such a violation, with sufficient ease to be on notice thereof. On this appeal, we do not deem it necessary to decide whether or not such a violation existed.

 Appellants contend that it should be inferred that, before the sales,

Glass had arranged with the reorganization committee to become the new company's president, or that he was influenced, when working with that committee, by his desire to attain that position. As he was elected president soon after the reorganization,[35a] perhaps such an inference can be made; but we think that that fact should be determined, one way or the other, only after further evidence is adduced in the district court. We think, however, that, although such a fact would strengthen the case against Glass, it is not necessarily required to justify a surcharge.

 5. Another argument based upon New York decisions (not suggested here or in the court below by appellees), we reject. According to those decisions, where a trustee, under an instrument securing negotiable bonds, has violated his duties but in such a way as not to involve a release or surrender of any trust assets, the right of action arising from the wrongdoing belongs to the persons who owned the bonds at the time of the commission of the wrong; and such a right, without an express assignment thereof, does not pass to a purchaser of any of the bonds, although the seller had no knowledge whatever of the trustee's dereliction.[36] On that ground, it is suggested that Cohen had no claim against the receivers and that therefore his estate has no standing here.

 To this suggestion there are several answers: It is not entirely clear that the receivers' conduct, as it now appears on this record, did not constitute a release or surrender of assets within the meaning of

no disclosure was made, from asking that Glass be surcharged. This would be particularly true if the judge relied on Glass to translate for him the detailed data into summary form and Glass did so misleadingly.

34 Martin v. Luster, supra; Gutterson & Gould v. Lebanon Iron & Steel Co., C. C., 151 F. 72, 76, 77.

35 Northern Pacific R. Co. v. Boyd, supra; Chicago, R. I. & P. R. Co. v. Howard, 7 Wall, 392, 19 L.Ed. 117; Louisville Trust Co. v. Louisville, etc., Ry. Co., 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130; Kansas City Terminal R. Co. v. Central Union Trust Co., 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028.

35a Glass, in his petition for rehearing, says that, in his affidavit, he mistakenly gave January 1, 1930, as the date of his election, but that the correct date is February 18.

36 Elkind v. Chase National Bank, 259 App.Div. 661, 20 N.Y.S.2d 213, affirmed 284 N.Y. 726, 31 N.E.2d 198; Emmerich v. Central Hanover Bank & Trust Co., 291 N.Y. 570, 50 N.E.2d 659; Hendry v. Title Guarantee & Trust Co., 255 App.Div. 497, 8 N.Y.S.2d 164, affirmed 280 N.Y. 740, 21 N.E.2d 515; Doyle v. Chatham & Phenix National Bank, 253 N.Y. 369, 171 N.E. 574, 71 A.L.R. 1405; Smith v. Continental Bank & Trust Co., 292 N.Y. 275, 54 N.E.2d 823.

See discussion of these cases in Manufacturers' Trust Co. v. Kelby, 2 Cir., 125 F.2d 650, 653; Elias v. Clarke, 2 Cir., 143 F.2d 640, 644; York v. Guaranty Trust Co., supra, 143 F.2d at page 512; President and Directors of Manhattan Company v. Kelby, 2 Cir., 147 F.2d 465, 474, 475.

the New York decisions.[37] Moreover, there is nothing to show that Cohen purchased these bonds in New York or that the bonds were in New York when he purchased them. Applying the New York rule of conflict of laws, the effect of a transfer of a negotiable instrument is determined by the law of the place where the instrument is at the time of transfer; see Restatement of Conflicts, § 349, and New York Annotations thereof (1935); cf. United States v. Guaranty Trust Co., 2 Cir., 69 F.2d 799, 801. In several other jurisdictions it has been held that a right of action for a tort to property, either real or personal, including a tort resulting from fraud, passes with the sale of the property to the purchaser although the seller does not expressly assign it; and, in cases not unlike the instant case, the federal courts, in pre-Erie-Tompkins days (Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487), so held.[38] These decisions are at odds with the apparent rationale of the New York decisions announcing the New York rule, i. e., that a mere assignment of a contract usually does not carry with it a claim for a breach occurring before the assignment.[39]

For all we know, as the record now stands, the jurisdiction where the bonds were when Cohen purchased them was one which does not follow the New York doctrine. We have found no other jurisdiction in which that doctrine prevails, especially where a sale of negotiable instruments is involved. Since, then, this question of appellants' standing was not raised by appellee in the court below or even here, we should, if we considered the New York decisions applicable to a claim against a federal court's receiver, and if we concluded that there was here no surrender of assets, go no further than we have done in other similar cases, i. e., remand for ascertainment of the facts as to the location of the bonds at the time of Cohen's purchase.[40]

But we think that, with respect to the obligations of a receiver appointed by a federal court, the New York rule should not control. A claim against a derelict receiver is not against an ordinary trustee but against a court's officer. Who has the right to assert such a claim is a question affecting the integrity of the court itself.[40a] The federal courts, in holding their

---

[37] Glass, as receiver, had a fiduciary position with respect to the interest of United in the Eureka stock; he held the "equity"; and Glass, it is charged, colluded with the reorganization committee to bring about the default which led to the sale of that stock and at a price which was below its real worth.

As to the difficulty, under the New York decisions, of determining when wrongful conduct by a trustee involves a surrender of assets, cf. President and Directors of Manhattan Co. v. Kelby, supra, 147 F.2d at page 474.

[38] See, e.g., Traer v. Clews, 115 U.S. 528, 529–541, 6 S.Ct. 155, 29 L.Ed. 467; Comegys v. Vasse, 1 Pet. 193, 213, 215, 216, 7 L.Ed. 108; Erwin v. United States, 97 U.S. 392, 396, 24 L.Ed. 1065; Pattiz v. Semple, D.C., 12 F.2d 276, affirmed 7 Cir., 18 F.2d 955; Zinn v. Denver Live Stock Commission Co., 68 Colo. 274, 187 P. 1033; Rice v. Howard, 136 Cal. 432, 69 P. 77, 81, 82, 89 Am.St.Rep. 153; Emmons v. Barton, 109 Cal. 662, 42 P. 303; Sherman v. International Life Ins. Co., 291 Mo. 139, 236 S.W. 634, 639; Billingsley v. Clelland, 41 W.Va. 234, 23 S.E. 812, 820, 821; Scott v. Brazile, Tex.Com. App., 292 S.W. 185; 5 C.J. 892; 6 C. J.S., Assignments, §§ 35, 36, pp. 1085, 1086; 8 C.J. 387; 10 C.J.S., Bills and Notes, § 203, pp. 690, 691; cf. City of

Parkersburg v. Brown, 106 U.S. 487, 503, 1 S.Ct. 442, 27 L.Ed. 238 (see page 495 of 106 U.S., page 448 of 1 S.Ct., to the effect that the bonds were sold at 80¢ on the dollar); Chapman v. Board of County Com'rs of Douglas County, 107 U.S. 348, 360, 2 S.Ct. 62, 27 L.Ed. 378; Board of Commissioners v. Irvine, 8 Cir., 126 F. 689, 693, 694; Chelsea Savings Bank v. City of Ironwood, 6 Cir., 130 F. 410, 413.

[39] Elkind v. Chase National Bank, supra, 259 App.Div. at page 666, 20 N.Y.S. 2d 213; Hendry v. Title Guarantee & Trust Co., supra, 255 App.Div. at page 500, 8 N.Y.S.2d 164.

[40] Benz v. Celeste Fur Dyeing & Dressing Corp., 2 Cir., 136 F.2d 845, 848; Nachman Spring-Filled Corp. v. Kay Mfg. Co., 2 Cir., 139 F.2d 781, 787; Zalkind v. Scheinman, 2 Cir., 139 F.2d 895, 904; United States v. Rio Grande Dam & Irrigation Co., 184 U.S. 416, 423, 424, 22 S.Ct. 428, 46 L.Ed. 619; Estho v. Lear, 7 Pet. 130, 8 L.Ed. 632; Armstrong v. Lear, 8 Pet. 52, 74, 8 L.Ed. 863; Security Mortgage Co. v. Powers, 278 U.S. 149, 159, 160, 49 S.Ct. 84, 73 L.Ed. 236; Pfeil v. Jamison, 3 Cir., 245 F. 119; Wyant v. Caldwell, 4 Cir., 67 F.2d 374; Columbus Gas & Fuel Co. v. City of Columbus, 6 Cir., 55 F.2d 56, 58.

[40a] Cf. Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 671, 64 S.

own officers to accountability, should not be hampered by state court decisions relating to ordinary trustees.[41] When the United States issues a check, rights in that check (despite Erie R. Co. v. Tompkins 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487) "are governed by federal rather than local law". Clearfield Trust Co. v. United States, 318 U.S. 363, 366, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838. When a federal receiver incurs obligations through misconduct, the title thereto is, we think, similarly to be determined by "federal law."

What, then, is the "federal law" applicable here? In answering that question, we observed that the New York doctrine has this undesirable practical result: The seller of such bonds—ex hypothesi unaware, at the time of the sale, of the wrong done by the trustee—in actual fact can have no notion of retaining any cause of action against the trustee; and the seller of a bearer bond is exceedingly hard to trace. The practical consequence of the New York rule therefore is that most of the claims against a trustee for wrong done, especially to holders of bearer bonds, will never be prosecuted unless the trustee has surrendered trust assets. That rule thus often serves, pragmatically, as a convenient means of trustee exculpation.

We think that it would be most unfortunate to apply such a rule to a wrongdoing federal receiver; it would do much to thwart the policy of inducing careful discharge of their duties by receivers. The doctrine, relative to receivers, of strict accountability, and of opposition to divided loyalties, is prophylactic; it aims not merely to punish actual evil in cases where it occurs but to avoid the "tendency to evil in other cases." Woods v. City Nat. Bank & Trust Co., supra; Weil v. Neary, supra; Crites, Inc. v. Prudential Co., supra; Jackson v. Smith, supra; Magruder v. Drury, 235 U.S. 106, 119, 120, 35 S.Ct. 77, 59 L.Ed. 151.

It is suggested that a purchaser (such as Cohen) should have no right against a receiver because otherwise the purchaser will acquire a windfall, since he, like the seller, knew nothing of that right when he purchased. But in a great variety of instances, purchasers are permitted to acquire windfalls, e.g., a buyer of land on which oil is discovered after the sale. The Restatement of Contracts, § 171(2) reads: "Unless otherwise provided in the assignment or by agreement of the assignee with the assignor or with the obligor, an assignee under an effective assignment for value has the same right to any securities for the assigned right that were available to the assignor, though he has not bargained for them, as if the assignor had agreed to transfer them." [42] If Glass was guilty of wrongdoing, that Cohen's estate will unexpectedly benefit can work no harm to Glass. We therefore reject the New

---

Ct. 268, 88 L.Ed. 376; Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250.

[41] See, e.g., as to "federal law" in various fields, Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L. Ed. 838; Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239; Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165; Prudence Realization Corp. v. Geist, 316 U.S. 89, 62 S.Ct. 978, 86 L. Ed. 1293; United States v. Forness, 2 Cir., 125 F.2d 928, 937–940; United States v. Pelzer, 312 U.S. 399, 402, 403, 61 S.Ct. 659, 85 L.Ed. 913; Morgan v. Commissioner, 309 U.S. 78, 80, 81, 626, 60 S.Ct. 424, 84 L.Ed. 585; Lyeth v. Hoey, 305 U.S. 188, 193, 194, 59 S.Ct. 155, 83 L.Ed. 119, 119 A.L.R. 410; American Surety Co. of New York v. Sampsell, 66 S.Ct. 571; Holmberg v. Armbrecht, 66 S.Ct. 582.

Many illustrations are given and discussed in Clark, State Law in the Federal Courts, 55 Yale L.J. 267 (1946).

We do not here consider the following suggestion: Restrictions on the bringing of stockholders' actions, such as those imposed by Federal Rules of Civil Procedure, rule 23(b), 28 U.S.C.A. following section 723c, or state statutes, are procedural; cf. Piccard v. Sperry Corp., 2 Cir., 120 F.2d 328 affirming D.C., 36 F.Supp. 1006; Galdi v. Jones, 2 Cir., 141 F.2d 984; Tower-Hill Connellsville Coke Co. v. Piedmont Coal Co., 4 Cir., 64 F.2d 817, 828, 91 A.L.R. 648 certiorari denied 290 U.S. 675, 54 S.Ct. 93, 78 L.Ed. 582; the restriction imposed by the New York courts on suits by assignees of bonds is similar.

[42] See Williston, Contracts (Rev. ed. 1936) § 447A.

And so where the assignee is ignorant thereof at the time of the assignment; see, e.g., Gay v. Hudson River Electric Power Co., C.C., 180 F. 222, 227; Edwards v. Bay State Gas Co., C.C., 184 F. 979, 982.

York rule and apply the rule adopted elsewhere.[42a]

■ Accordingly, we hold that appellants have the right, for their own benefit and that of other holders of non-deposited bonds [42b] to have Glass surcharged on account of his wrongdoing, if any. In so holding, we do not mean that, even if appellants lacked that right, the district court should have disregarded the merits of appellants' charges against Glass and should have refrained from directing an investigation for the benefit of whatever persons may have been injured by Glass' alleged misconduct. It is fortunate, however, that appellants have the requisite standing and self-interest in the investigation, since it might well be difficult for the court otherwise to obtain the needed services of a lawyer and an expert accountant.[43]

6. Appellants contend that the New Middle States company should be held liable together with the receivers. On oral argument appellants supported this contention by reference to an agreement made by the new company, in connection with the reorganization, to discharge the receivers' obligations. Appellees did not, on the oral argument, question the existence of such an agreement; but we have not found it in the record before us. If there is one, we think it would not include the kind of liability here sought to be imposed, absent fairly specific language indicating otherwise. We leave that question for the court below.

Should it, however, appear (of course, we do not know that it will) when all the facts are before the court, that the reorganization committee and, through it, the new company, conspired with Glass to deprive non-depositing United bondholders of their legitimate share of the United assets [44] in a way which involved a fraud on the court,[45] then it may be that, notwithstanding the decrees, the new company will be liable with the receivers. Jackson v. Smith, supra; Ferguson v. Wachs, 7 Cir., 96 F.2d 910; cf. Irving Trust Company v. Deutsch, 2 Cir., 73 F.2d 121, 123, 125.

■■ 7. We think that undoubtedly, in connection with the receivers' final accounting and discharge, appellants should have access to the engineers' and accountants' reports and, indeed, to anything in the books and papers in the hands of the receivers. Since, as Glass has made clear, the affairs of the various companies in the several receiverships were "administered as a unity," and were "inextricably intertwined," there is every reason why appellants in connection with the United receivership, should have similar access to the receivers' books, records and files in all the receiverships in the court below.[46] Appellees argue that the final accounting in each receivership should stand on its own bottom. But it would seem from Glass' statement that such a method would be highly artificial and might unduly complicate matters, since facts revealed with respect to one receivership might so affect another as to necessitate undesirably the reopening of an order of a discharge theretofore made. We think orderly administration requires that the final accountings and discharges should be dealt

42a See, e.g., cases cited in note 38, supra.

42b See note 13, supra.

43 For the court merely to appoint a lawyer who would be paid on a contingent basis and who (unlike appellants' lawyer, who may in any event look to the Cohen estate for payment) would go unpaid if unsuccessful, would be insufficient, as the services of an expert accountant are also needed. The S. E. C. is not authorized by statute to engage in such an undertaking except under the Chandler Act, 11 U.S.C.A. § 1 et seq.

44 We do not here refer to the doctrine of the Boyd case.

45 Cf. Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250.

46 Appellees contend that the examination which appellants ask concerns the value of the physical properties; that the physical properties were in the custody of ancillary receivers in other jurisdictions; and that, as those ancillary receivers have been discharged, it will be improper to permit such examinations. But, as the receivers' interim reports and Glass' affidavits show, the ancillary receivers reported to the receivers in the court below. These receivers reported on June 1925 that they "have conducted a principal office with which the ancillary receivers have been in constant touch by daily correspondence, telephone and telegraph concerning day to day developments, sale and storage of oil, drilling of wells and other affairs, in connection with the running of the business." More important, appellants seek no relief with respect to the physical properties but want, and should be allowed, access to data concerning those properties since such data may have an important bearing on the questions involved here.

with just as the court dealt with the receiverships when they were active, i. e., as a unit.

Reversed and remanded.

SWAN, Circuit Judge (dissenting).

These are appeals from two orders in an equity receivership. One of the orders approved the final report and accounting of the receivers of United Oil Producers Corporation and discharged the receivers in respect of all matters embraced in their said report and accounting; the other order denied a motion for a discovery and inspection of the books of account and other papers of the receivership. The appellants are the executors of William W. Cohen, deceased, and his widow, sole beneficiary under his will. Any rights they may have to surcharge the receivers or to inspect the books and papers of the receivership are derived under the will by reason of Cohen's ownership of $32,200 of bonds issued by United. Unless Cohen at the time of his death in 1940 had rights against the receivers based on their conduct as such receivers, the appellants have no standing to object to the final accounting. It was imperative, therefore, for them to prove that Cohen did have such rights. In my opinion they failed to make such proof. Consequently the orders should be affirmed.

The theory upon which the appellants assert a right to object to the receivers' accounting is that they were guilty of a breach of fiduciary duty in not reporting to United's bondholders and to the district court that United's assets were of sufficient value to pay the bonds in full and in consequence of the concealment of such information the assets were sold at judicial sales in 1929 at too low a price. Such concealment is said to be equivalent to a fraudulent misrepresentation as to the value of United's bonds and to have caused the bondholders who elected to take cash instead of new securities under the plan of reorganization, to accept only 68 cents on the dollar instead of getting full payment of their bonds. Assuming these allegations to be true, the receivers' misrepresentation was a breach of duty to the owners of bonds at the time when the misrepresentation was made, that is, at a time prior to the judicial sales. The $32,200 of bonds upon which Cohen received 68 cents on the dollar were acquired by him at some unspecified date after the judicial sales. Hence the receivers' misrepresentations as to their value were not a tort against Cohen but against the owner of the bonds in November 1929. In Elias v. Clarke, 143 F.2d 640, 644, we held that under New York law a claim for fraud or misrepresentation in connection with an obligation evidencing a debt, whether for damages or rescission, does not pass with the transfer of the obligation in the absence of a special assignment of the claim. Cohen was a securities broker in New York City and it is a natural inference that he purchased the bonds here. If so, neither he nor his executors acquired any right to claim damages for the receivers' tort to his predecessor in title.[1] If he acquired them outside the State of New York and in a state where the seller's tort claim would pass without a special assignment of the claim, it devolved upon his executors to make proof of that fact in order to show their right to object to the receivers' final accounting. They offered no such proof. The district court held that they were "without standing to object to the final report and accounting." This conclusion was right, whether or not we agree with the reasoning by which the district judge reached it. Accordingly I think the orders should be affirmed.

---

[1] The majority opinion suggests that because this is a federal receivership we may hold that Cohen's purchase of the bonds, even if the transfer occurred in New York, passed to him the seller's tort claim against the receivers. This seems to me in direct conflict with the rule of Erie R. Co. v. Tompkins.